## GODDARD *vs.* MALLORY.

Where there is no person or corporation named in a bill of lading, as contracting for the carriage of the goods, it is competent, in an action by the owner of the goods, to recover damages for their non-delivery, to show who was the owner of the vessel named in the bill of lading, by which the goods were to be carried.

Where the agents of a vessel are in the practice of having clerks on the wharf, who sign bills of lading there, the agents are bound by this act of a clerk in signing a bill of lading there, before the goods are delivered on board; and the owner of the vessel is bound by any act which binds such agents within the scope of their agency.

Where the practice is to issue bills of lading when goods are delivered on the dock, the owner of a vessel cannot, after this has been done, insist that a bill can only be issued after the goods are on board the vessel.

Although, when a bill of lading is executed by the captain, it is very proper that he should require the goods to be on board before he signs the bill, yet when the owner himself, or his agent, receives the goods, he is at liberty to deliver the bill whenever he deems proper.

The agents of a ship owner have power to make a contract, binding upon their principal, to carry goods by the next vessel of the owner, sailing to the port of destination.

But neither such agents, nor the owner of the vessel, can send goods by a vessel other than that named in the bill of lading, without assuming the whole risk of loss or damage to the goods while on such vessel.

In the absence of evidence of a general custom controlling bills of lading, in respect to the time and manner of shipment, it must be assumed that if the name of a vessel is inserted in the bill, it is because the owner designates her as the proper one to take the goods, having regard to the voyage and time of sailing.

APPEAL by the plaintiff from a judgment ordered at the trial, dismissing the complaint, with costs.

The action was brought to charge the defendant, as owner of the steamship *Euterpe*, for the non-delivery of goods described in the bill of lading as having been shipped on board that vessel. They were, in fact, shipped on board the *Twilight*, another vessel belonging, also, to the defendant, which was lost by perils of the seas. This loss was a conceded defense to the claim, unless the non-shipment of the goods by the *Euterpe* made the defendant liable. The plaintiff resided in South Carolina. On the

Goddard *v.* Mallory.

2d of November, 1865, he bought the goods in question of S. F. Johnson & Co. New York, and directed them to be shipped to Wilmington by steamer, without specifying any vessel. The sellers saw the following advertisement in a newspaper, viz :

"For Wilmington, N. C., Direct.

ATLANTIC COAST MAIL STEAMSHIP CO.

*Euterpe,* . . . . . Captain Eldridge.
*Twilight,* . . . . . Captain Spicer.

The elegant and fast steamship *Euterpe*

Is now receiving freight at pier 37, North river, and will leave, as above, on Saturday, November 4th, at 3 P. M.

For freight or passage—having superior accommodations—apply to    LIVINGSTON, Fox & Co.

141 Broadway.

Agents at Wilmington, Harris & Howell.

Oct. 30."

It was admitted, by counsel for the defendant, that this advertisement was published on the 30th and 31st of October, and on the 1st, 2d, 3d and 4th of November, 1865, in the *Journal of Commerce.* The seller directed his clerk to send the goods to the *Euterpe,* as being the vessel first to sail, knowing nothing, however in the way of choice, between the *Twilight* and the *Euterpe.* The carman, accordingly, took the goods to the pier advertised, and presented for signature and got the following receipt :

"NEW YORK, November 4th, 1865.

Received from S. F. Johnson & Co. in good order, on board the steamer *Euterpe.*

| MARKED. | | ARTICLES. WTS. & MEAS. |
|---|---|---|
| N. B. GODDARD, | | (1) One case Fancy Goods, |
| Marion C. H., S. C. | Hawthorne. | (1) " " Ink, |
| Care Worth & Daniels, | | (1) " Bundle of Whips." |
| Wilmington. N. C. | | |

Which was prepared in the seller's establishment. From this the shipper filled up the bill of lading, and procured it to be signed by one Dayton, a receiving clerk on the pier. The *Euterpe* did not sail on the 4th November, as advertised. She had been delayed on her return trip from Wilmington, and was either not in port or had just arrived, so that the trip of the 4th was missed. The next trip, that of November 11, was made by the *Twilight,* and the goods in question were then sent by her. The Atlantic Coast Mail Steamship Company was an incorporated company, running lines of steamships to Wilmington and other southern ports. Livingston, Fox & Co. were the general agents of the company at New York. The bill of lading was headed "Atlantic Coast Mail Steamship Line," and Dayton, who signed it, was a receiving clerk in the employ of Livingston, Fox & Co. on their wharf, who signed for them, "For agents, Dayton." The defendant was not a member of that company, and Dayton was not the defendant's agent, but a clerk of the company. But the company, which owned vessels of their own, running on their other lines, took these vessels from the defendant, as a temporary arrangement, and put them on their Wilmington route. The precise terms of the hiring are left, by the evidence, somewhat vague. A witness (H. S. Livingston, of the firm of Livingston, Fox & Co.) testified: "We did not take up the *Euterpe* and *Twilight;* the vessels were put in our hands by Mr. Mallory, to run to Wilmington; the arrangement was that we should advertise them under his directions, load and send them to sea, and receive their cargoes and passage money, as he directed; he had his own captain and crew on board the vessels, and was to be at liberty to manage them as he pleased." Wharfage was charged to each vessel coming to the wharf, and if this wharfage did not cover the expenses of the wharf, including the salaries of the captain of the wharf and of clerks, like Dayton, Livingston,

Fox & Co. in their accounts, charged the deficiency against the vessels running in the line, in proportion to their occupancy of the wharf. The defendant, as owner, attended to victualling, supplying and manning his vessels, and the freight and passage money earned by them he received from the Atlantic Coast Mail Steamship Company, less a commission, retained by their agents, on the whole freight and passage money. For this commission they advertised the vessel and procured freight. "There was no other person, beside our firm, so far as I know, to whom application might be made for freight or passage."

The loss to the goods having occurred from a cause which ordinarily exonerates carriers, the plaintiff's ground for holding the defendant liable was a breach of contract, in sending the goods by another vessel than that named in the bill of lading. The court held that no such contract was shown to bind the defendant, and directed a nonsuit.

*Scudder & Carter,* for the appellant.

*S. P. Nash,* for the respondent. I. A bill of lading is a receipt for goods shipped on board, and never, by its own force, binds the vessel or her owners in respect to goods not put on board. (*Schooner Freeman* v. *Buckingham,* 18 *How.* 182. *Grant* v. *Norway,* 10 *C. B.* 665. *Griswold* v. *Haven,* 25 *N. Y. Rep.* 595, 604, 606.) Though as against one who, on the faith of the representations contained in a bill of lading, makes advances upon it, this doctrine may have lately been shaken; as against the shipper himself, who is recited to have put the goods on board, there can be no doubt that he cannot claim that the bill of lading is conclusive that they were put on board. Here the shipper prepared the receipt and bill of lading in his own store, in advance of the goods being put on board.

II. The bill of lading is not, itself, an agreement to put on board. Such an agreement may be established, by a

Goddard *v.* Mallory.

delivery at the vessel's side, and such a delivery does place the goods at the carrier's risk. But the carrier's obligation is an obligation to carry, and he is relieved from it by a loss caused by peril of the sea. (*See Bulkley* v. *Naumkeag Steam Cotton Co.*, 24 *How. U. S. Rep.* 386.) Here the loss was caused by peril of the sea, and no liabilities can be established except by adding something to the ordinary obligations of the bill of lading.

III. The liability, then, if any was incurred in this case, was by the delivery of the goods on the wharf, and not by the signing of a bill of lading. (1.) Where goods are delivered at the wharf of a line of steamers running periodically, the delivery without special directions to send them by a particular steamer, leaves the agents of the line free to send them by any vessel of the line. If accident disables one, to send them by the next. (*Williams* v. *Vanderbilt*, 28 *N. Y. Rep.* 217.) (2.) No special directions were given in this case. The carman and receiving clerk both supposed the *Euterpe* would be the next vessel, and would take the goods, but no contract was made to that effect. (3.) The receipt of the goods, as on board the *Euterpe*, signed by Hartshorne, a receiving clerk, and the bill of lading issued on the strength of it, were neither of them, therefore, agreements that the goods should go on the *Euterpe*. They contain no words of undertaking or contract to that effect. They were simply premature, anticipatory recitals of a delivery on board, which all parties knew to be untrue. They amounted to no more than the advertisement did; that is, a statement that the *Euterpe* would sail on the 4th November.

IV. But if the papers are construed to be an absolute contract that the *Euterpe* should take the goods, neither Dayton nor Hartshorne had any authority to make such a contract. Their only authority was to receive goods to be shipped in due course. If the paper given had been a special agreement, acknowledging the receipt of goods on

the wharf, and agreeing to send them at some future trip, by some particular steamer, express proof of such an authority, on the part of a receiving clerk, would have to be shown. The case is not aided by perverting the ordinary meaning of a bill of lading, and construing it to import such a contract.

V. But if there was any valid contract to send the goods by the *Euterpe*, it was the contract of the Atlantic Coast Mail Steamship Company, or Livingston, Fox & Co.; not that of the defendant. (1.) It was the Atlantic Coast Mail Steamship Company that advertised the vessels; it was their bill of lading that was issued; it was to one of their clerks that the goods were delivered, and another of them signed the bill of lading. (2.) If the Atlantic Coast Mail Steamship Company be considered freight agents of the defendant, as such they would have no right, on the evidence, to sign special contracts for the future shipment of goods by particular vessels, or on particular days. (3.) But the Atlantic Coast Mail Steamship Company were not, nor were their agents, Livingston, Fox & Co. agents of the defendant. They were charterers of the defendant's vessels, paying them the net freight, as distinguished from a gross sum. The freight arrangements were made by the Atlantic Coast Mail Steamship Company, in their own name, and as suited their convenience. The obligations of the defendant commenced only when the goods were delivered specially into charge of persons belonging to his vessels.

VI. But assuming that there was a contract to carry by the *Euterpe*, a breach of it does not necessarily involve liability for the goods. If the *Euterpe* had sailed on the same trip on which the *Twilight* did, that is, leaving on the 11th November, she would have encountered the same storm. It was, therefore, the fact of the goods having started on the 11th, instead of the 4th, November, rather than their having gone in the *Twilight* instead of

the *Euterpe,* which led to their loss. But clearly there was no contract to send the goods on the 4th. If the *Euterpe* had sailed with the goods on the 11th, the plaintiff would simply have had the delay to complain of. This, unless amounting to a breach of contract, exposes the carrier only to special damages caused by the delay, but does not make him an insurer against excepted perils.

VII. The case is put by the complaint as arising upon breach of contract; the wrongful sending by the *Twilight,* after agreeing to send by the *Euterpe;* that this was the cause of the loss is a *non sequitur,* as has already been shown. But the loss was by a peril of the sea, or act of God, for which a carrier is not liable, and the real point of the plaintiff's claim, (unless, indeed, the suit be, in fact, that of the insurance company,) is that he did not protect himself against this loss by an effectual insurance. The defendant cannot be made liable for this. Assume that there was negligence in giving out the receipt and bill of lading, before the vessel was ready to sail; that there was negligence in not advising sundry shippers of the change of trip, and change of vessel. This was the negligence of Livingston, Fox & Co. as agents of the Atlantic Coast Mail Steamship Company; not of the defendant. And if this was negligence, the plaintiff is guilty of contributory negligence in taking his shipping document in advance, and making his insurance to cover a specific vessel of the line, when he might have known that the substitution of another might be necessary. But the case was not tried on the ground of negligence, and the plaintiff cannot, on this hearing, claim so to place it.

VIII. The case was one of mutual mistake, involving no bad faith on either side. If necessary, the papers should be reformed, so as to express the real contract, which was simply that the goods were received to be transported by the first vessel of the line. In this view, the loss being by peril of the sea, must be borne by him

Goddard *v.* Mallory.

on whom it directly falls, not on other parties who may, by remote links of contributory acts, be considered to have occasioned not the loss, but the consequences of the loss, to the plaintiff.

IX. The plaintiff's exceptions should be overruled, and judgment rendered for the defendant.

*By the Court*, MULLIN, J.   My impression on the argument was that the heading of the bill of lading, "Atlantic Coast Mail Steamship Line," was to be taken to be the name of the Atlantic Coast Mail Steamship Company, and therefore the bill of lading was to be treated as a contract with that company, and if so it was not competent to prove that it was in fact made with the plaintiff.   But it appears by the evidence of the witness, Livingston, one of the firm of Livingston, Fox & Co. agents for the defendant, the Mail Steam Ship Company, and others, owners of vessels running to certain southern ports, that his firm advertised the vessels belonging to the several owners, as belonging to the Atlantic Coast Steamship Line.   If this is a correct construction of the language at the head of the bill of lading, it follows that there is no person or corporation named on the bill as contracting for the carriage of the goods.   It was competent, therefore, for the plaintiff to show who was the owner of the vessel named in the bill of lading, by which the goods were to be carried.

The defendant was concededly owner of the *Euterpe*, and liable upon the bill of lading.

It appears by the evidence of Mr. Livingston that his firm had clerks on the wharf, who signed bills of lading. Dayton was one of those men.   Livingston & Co. were bound by the acts of Dayton, and the defendant was bound by any act which bound Livingston & Co. within the scope of their agency.

Where the practice is to issue bills of lading when goods are delivered on the dock, it is too late for the owner of

Goddard *v.* Mallory.

the vessel to insist that a bill can only be issued after the goods were on board the vessel.

When the bill of lading is executed by the captain, it is very proper that he should require the goods to be on board before he signs the bill. But when the owner himself, or his agent, receives the goods, he is at liberty to deliver the bill whenever he deems proper.

But it is said that neither Dayton nor Livingston & Co. had any power to make a contract binding the defendant to carry the plaintiff's goods on any particular ship—that it was the agent's duty to contract to carry on the first vessel of the defendant sailing after the receipt of the goods.

The power conferred on Livingston & Co. by the defendant is not defined, and I am not aware of any rule of law, and no practice is proved, restricting an agent of an owner to contract to carry by the next vessel of the owner, sailing to the port of destination.

I cannot doubt but that Livingston & Co. had the power to make the contract in question.

But I do not think that Livingston & Co. or the defendant could send the goods by a vessel other than that named in the bill of lading, without assuming the whole risk of loss or damage to the goods while on such vessel. We cannot say that if the goods had gone by the *Euterpe* they would have been lost. Indeed, that vessel arrived in safety at her port of destination, and hence the plaintiff's goods would, in all probability, have also arrived safely.

In the absence of evidence of a general custom controlling bills of lading in respect to the time and manner of shipment, we must assume that if the name of a vessel is inserted in the bill, it is because the owner designates her as the proper one to take the goods, having regard to the voyage and time of sailing. We know that insurers, as a general, if not universal rule, insist upon knowing the name of the vessel in which goods are to be carried, and

that they regulate the risk accordingly. To permit the carrier to transfer goods from the vessel named in the bill to another, would avoid the insurance, and impose upon the owner of the goods risks which were neither known to, nor contemplated by him.

It is no answer to say that in this case there was no insurance, and hence the danger from the avoidance of a policy is not before us. We are inquiring what the rule of law is; and if it has not been settled, but is to be settled in this case, it is necessary in settling it, to take this consideration into the account, giving to it such weight as its importance demands.

If it is established that the owner of the ship may transfer the goods to another vessel at pleasure, it must follow that owners of goods cannot insure, or the insurance company must cease to consider the vessel as entering into the risk until one or the other thing is done—transfer cannot be permitted.

For these reasons, the judgment should be reversed, and a new trial ordered; costs to abide the event.

[NEW YORK GENERAL TERM, November 2, 1868. *Ingraham, Mullin* and *Peckham*, Justices.]