A. A. MELLIER ET AL., Appellants, v. ST. LOUIS AND NEW
ORLEANS TRANSPORTATION COMPANY, Respondent.

November 6, 1883.

1. COMMON CARRIERS — BONDED GOODS. — A common carrier of bonded goods
who receives goods in bond, for carriage, the bill of lading of which
recites that they are to be transported in bond, is liable for a loss arising
from a shipment of the goods on an unbonded vessel.

2. —— CONTRACTS OF CARRIAGE — FORWARDER. — A common carrier to
whom is tendered goods as a common carrier, can not, without the ship-
per's knowledge and consent, receive them as a mere forwarder.

APPEAL from the St. Louis Circuit Court, BOYLE, J.
*Reversed and remanded.*

JOHN G. CHANDLER, for the appellants: Taking the
goods out of bond and shipping them on an unbonded ves-
sel constituted a conversion. — Ang. on Car., sects. 431–
433. The acceptance of the wine " for transportation in
bond to St. Louis," amounted to an express promise to so
transport. — Story Eq. Jur., sect. 1041. The bill of lading is
the representative of the goods. — Benj. on Sales, sects. 813,
822, 864, note; 1 Sm. Ld. Cas. 400, 417, 421; *Dav. Nat.*
*Bank* v. *Homeyer*, 45 Mo. 145. The acceptance and deal-
ing with the bill of lading was an acceptance of the goods. ——
Benj. on Sales, sect. 148. The measure of damages is
the value of the goods at the time and place of destination,
to which the jury may add interest to the time of trial. —
*Gray* v. *Packet Co.*, 64 Mo. 47, 50; *Smith* v. *Williams*,
13 Mo. 352; *Sparr* v. *Wellman*, 11 Mo. 230.

GIVEN CAMPBELL, for the respondent.

THOMPSON, J., delivered the opinion of the court.
The petition declares against the defendant as a common
carrier of bonded goods, for the loss of certain packages of
wine delivered to it at New Orleans, to be conveyed to the

plaintiffs at St. Louis in bond. The answer is a general denial. A jury was waived, and the court, after hearing the evidence, ruled adversely to the plaintiffs upon a number of declarations of law submitted by them, and gave of its own motion a declaration of law, upon which the plaintiffs took a voluntary nonsuit, and, having moved the court unsuccessfully to set the same aside, have appealed to this court.

The incorporation of the defendant is admitted. The defendant's articles of association were put in evidence, and these show that it was incorporated for the following purposes : " To carry on the business of transportation upon the waters of the Mississippi River and its tributary waters and other waters of the United States ; to lade and carry cargoes of merchandise and other property for hire, * * * and to do and perform all other acts necessary and proper in the business of transporting, storing, and lading goods and merchandise for hire ; * * * and to carry on any and all other business in connection with or essential to the business of transportation."

It was also shown that the defendant had given bond to the United States in conformity with the provisions of the act of congress of July 14th, 1870, relating to the transportation of unappraised dutiable goods in bond. This bond was dated January 9, 1880, and contained the following recitals : " Whereas the above bounden St. Louis and New Orleans Transportation Company has applied to be authorized and designated as a common carrier for the transportation of unappraised dutiable merchandise, under sections 2990 to 2998, inclusive, of the Revised Statutes and the rules and regulations prescribed by the secretary of the treasury in pursuance thereof, from the port of New Orleans in the state of Louisiana to the port of St. Louis in the state of Missouri, in the following manner, viz. : In the following named steamers and barges owned and controlled by the said company and plying upon the Mississippi River between the ports named [here followed the names of the boats and barges] : * * * Now, * * * if the

above bounden principal shall duly observe and faithfully comply with the laws of the United States and regulations of the treasury department made in pursuance thereof pertaining to the transportation and safe delivery of imported merchandise under the provisions of the act of congress entitled 'An act to reduce internal taxes and for other purposes, approved July 14, 1870, and of the acts amendatory thereof,' and shall pay the necessary expenses of such locks, seals, and other fastenings as may be prescribed by the secretary of the treasury for securing the custody and safe transportation of such merchandise * * * and shall, without delay, transport and make prompt report and safe delivery of all merchandise delivered to said principal for transportation under the provisions of said act to the collector or other proper officer of customs at the port of destination in the manner required by law and the regulations aforesaid," etc. The record shows that this bond was on file in the custom-house at St. Louis and that the company was in the habit of carrying bonded goods; though the company offered evidence tending to show that, for several months prior to the date of the transaction in controversy, it had refused to carry *wines* in bond and had directed its agents at New Orleans not to receive any such wines, because it could not transport the same on its barges secure from theft by its own employes and others.

It also appears, without contradiction, that the defendant, by resolution of its directors, directed its president to execute a customs power of attorney to Allan B. Bennett, which was accordingly done, and the resolution and power were both filed in the custom-house at New Orleans. On the face of the resolution the defendant entitles itself "U. S. bonded line for imports and exports." The resolution bears date July 21, 1881, and directs that the president of the company, Henry Lourey, be, and he is hereby empowered and requested to execute a customs power of attorney in the usual form to Allan B. Bennett, of New Orleans, for

the transaction of necessary custom-house business of the company at that port. The power of attorney constituted Bennett the company's attorney for it and in its name, place, and stead, to enter in due form of law at the custom-house in the city of New Orleans, all goods, wares, and merchandise which have been imported or may be hereafter imported by it, or which have arrived or been consigned, or which may hereafter arrive or be consigned to it, or in which it may be interested or concerned ;  *  *  * to execute  *  *  * bonds which may be required to secure the duties thereon, or for the transportation or exportation of the same ;  *  *  * and generally as its attorney, to do, transact and perform all custom-house business of what kind soever, in which it is or may be interested or concerned, as fully and effectually to all intents and purposes, as it, if present there in person, could do ;  *  *  * and generally to do and perform all things relating to the premises which it could lawfully do if personally present, and as fully and effectually, to every intent and purpose, although the same should seem to require more precise or special authority than is herein expressed.  *  *  * It is hereby declared and understood that this power shall be and remain in full force and virtue, until revoked by written notice given to the collector." This power had not been revoked at the time of the trial of this case in the circuit court.

The defendant, also, in its correspondence with business men, used a letter-head, on which it was designated in print as " U. S. bonded line for imports and exports." Its agents for the transaction of its business at New Orleans, Messrs. Seligman, Hellman & Co., used a letter-head upon which the defendant was similarly designated. The evidence shows without dispute that these letter-heads were used at the time of the transaction in controversy, both by the defendant's secretary in St. Louis, in its correspondence with the plaintiff touching this transaction, and also by

Messrs. Seligman, Hellman & Co. at New Orleans. Mr. Bennett, to whom the above customs power of attorney had been given, was a clerk in the employ of Messrs. Seligman, Hellman & Co.

We do not understand that the scope of the agency of Seligman, Hellman & Co. is one of the questions arising upon the record, in the view of the declaration of law which the learned judge gave, and which drove the plaintiffs to a nonsuit. We may say, however, in passing, that the evidence leaves no room to question that they were the general agents of the defendant for the purpose of attending to all of its business at New Orleans, touching the receiving of goods for shipment, the collecting of freights, and the attending to business in the custom-house relating to foreign consignments made to the defendant. It also appears that they had power to receive for the defendant bills of lading of foreign shipments; that they had power through Mr. Bennett, who, as already stated, held defendant's customs power of attorney, to do the necessary business in the custom-house with regard to such shipments, to forward such shipments from New Orleans to St. Louis, and generally to do all that was necessary in regard to these things. In most cases, freight contracts were made at the home office, and Seligman, Hellman & Co. were notified of the same.

Such appears to have been the scope of their agency until the tenth day of September, 1881. It appears that on the ninth day of that month the defendant sold all its boats and barges to another corporation, called the Mississippi Valley Transportation Company, and went out of business as a common carrier, except in respect of consignments which had already been made to it, and as to these it had made arrangements with the Mississippi Valley Transportation Company for that company to take charge of such business. On that date, the 10th of September, or possibly on the day before or the day following, the president

of the defendant sent to Messrs Seligman, Hellman & Co., its agents at New Orleans, and the latter received, the following telegram : —

" You will please at once turn over to John Stevenson, agent, all barges and other property belonging to this company, taking his receipt for the same in detail. Deliver to him also all up freights now in hand, or to arrive on our contracts or to our care. New company fully organized and in operation. Letter on Monday.

(Signed)                " H. LOUREY, *President*."

A good deal has been said about the arrangement between the defendant and C. H. Wyman, a custom-house broker at St. Louis, by which the defendant had agreed to pay Wyman a small commission on certain goods which he might cause to be shipped over defendant's line.

It appears that Wyman had made known to the defendant's president, Captain Lourey, about a year before the date of the transaction in question, that he had power, in the course of his business, to influence consignments to particular carriers, and that he would be willing to cause goods to be consigned to the defendant, provided a small commission should be paid for that purpose. Captain Lourey then agreed to pay a commission of two and one-half per cent. upon the freights that should be consigned to his company through the influence of Mr. Wyman. The evidence is conflicting whether this arrangement was limited to a particular class of freight, which excluded wine, or whether it was made with reference to freights generally, without any specification that the defendant would not receive consignments of particular goods, such as wine. It also appears that the consignment of the freight in controversy was made to the defendant in consequence of this arrangement, and that it came through the agents or correspondents of Wyman, Messrs. Cunningham, Shaw & Co., of Liverpool. We do not regard this matter as an important circumstance in the

case, because we do not think it amounted to an agreement between the defendant and Wyman, or between the defendant and any one whom Wyman may have represented as a custom-house broker in connection with the freight in controversy, to carry it from New Orleans to St. Louis at all events.

In this state of things, before the 10th of September, 1881, and consequently while the defendant was engaged in business as a common carrier of United States bonded goods between the port of New Orleans and the port of St. Louis, the plaintiff purchased of Joseph C. Gordon at Jarez de la Frontera, in Spain, certain packages of wine for shipment to St. Louis. They were shipped to Liverpool on board the Corcyra, an English vessel, and were there transhipped on the steamer Charrington for New New Orleans, consigned to the defendant. The bill of lading of the steamer Charrington showed that the goods were shipped by Messrs. Cunningham, Shaw & Co., at Liverpool, for New Orleans, consigned to this defendant " for transportation in bond to St. Louis." This bill of lading appears to have been executed in triplicate. An original of it was received by Seligman, Hellman & Co. before the 10th of September, 1881, and consequently before the company ceased business as a common carrier. It appears that they also received the usual consular certificate. Another original of it was sent to the plaintiffs, and received by them at St. Louis.

The goods had been thus shipped in accordance with shipping instructions given by Wyman to Gordon in St. Louis; Wyman telling Gordon that he must ship them to Liverpool, and Cunningham, Shaw & Co., his (Wyman's) agents, would attend to the rest.

Now, the goods arrived in New Orleans about the 20th of September, ten days after the defendant had sold out its boats and ceased business as a common carrier. They were tendered by Seligman, Hellman & Co., to Mr. Stevenson,

agent of the Mississippi Valley Transportation Company, who refused to receive them on the ground that he was not going to carry wine on the barges of his line.

The tender seems to have been made in this way : On receipt of the telegram above mentioned, Seligman, Hellman & Co. turned over to Stevenson, the agent of the new company, the papers and property, including all freight engagements of the defendant, among which was the bill of lading of the steamer Charrington of these wines. These wines could not be gotten out of the custom-house except by Bennett, as they were consigned to the defendant, and as Bennett held the defendant's customs power of attorney, which was not revoked. When Stevenson saw that the goods represented by this bill of lading were wines, he told Bennett that he would not receive them, as he was not going to carry wine on the barges of his line. Now, aside from the boats and barges of Stevenson, there were no boats in port which were authorized to carry bonded goods. In this state of things, Bennett and Seligman, Hellman & Co., and Stevenson, consulted together as to what it was best to do. It seemed there were two things they might have done, which would have exonerated this defendant: 1. As the act of congress relating to the transportation of goods in bond (21 U. S. Stat. at Large, 173), impliedly allowed them to hold the goods for ten days after they were landed from the importing vessel, they might have telegraphed to the plaintiffs for instructions ; or (2) they might have paid the freight and sent the goods to a bonded warehouse, and advised the plaintiffs that they had done so. They did neither. They took the goods out of bond and shipped them, consigned to the plaintiffs at St. Louis, on a boat of the Anchor Line, which was not bonded. In doing this, they unquestionably acted in good faith, and did what they supposed was the best thing which they could do for the interest of the plaintiffs. But the testimony clearly shows that the result of what they did was to deprive the goods of

their commercial character as bonded goods. That is to say, wines which come to this market in bond, and which the owner is able to deliver lying in a bonded warehouse, have the reputation among merchants of being what they purport to be ; the presumption is that they have not been tampered with ; but it is not so as to wines which are not sold in bond ; and the same quality of wines out of bond, the evidence shows, sells for much less than in bond.

These were substantially the facts of the case ; and upon these facts the plaintiffs asked the court for a number of declarations of law, which the court refused. These we need not consider, because the declaration of law which the court gave of its own motion, shows clearly the view which the court took of the law applicable to the facts and the ground on which the case was made to turn. This was as follows : —

" The court of its own motion declares the law to be that, if it appears from the evidence that, at the time the goods in controversy arrived at the port of New Orleans, the defendant had disposed of all its boats or vessels for the carriage of goods, and was not then engaged in the business of a common carrier of goods, either in bond or otherwise, then, unless it had agreed so to do, there was no obligation resting on defendant to carry said goods from New Orleans to St. Louis, even though said goods had been consigned to defendant at said port of New Orleans, with directions that they were to be thence transported in bond to said city of St. Louis ; and although said goods may have been received by defendants or its agent on their arrival at the port of New Orleans, yet if it appears that the defendant had not previously agreed to carry said goods, and that it or its agent received the same, not as a common carrier, but simply as the consignees thereof at said port, and that it paid the duties on and forwarded said goods to plaintiffs at St. Louis by the steamer Montana in good faith, believing such course to be for the best interest of plaintiffs

and because it was unable to procure their transportation to St. Louis in bond, then plaintiffs are not entitled to recover in this action ; and the court further instructs that upon the evidence adduced, the defendant can not be held to have agreed to carry said goods by reason of any direction or agreement concerning said goods made by Charles H. Wyman.''

In the view we take of the duty of the defendant in the premises, this declaration of law is correct except in two particulars. We agree with the learned judge, that if the defendant, at the time of the arrival of the goods in New Orleans, had disposed of its vessels and gone out of business as a common carrier, it was under no obligation to transport these goods from New Orleans to St. Louis, not having expressly contracted to do so. We do not regard the evidence of the arrangement between the defendant and Wyman, whereby the latter was to pay commissions to Wyman upon goods which Wyman might cause to be consigned to the defendant for transportation, as an agreement to carry in any event any goods which Wyman might thereafter consign to them. We do not think that the arrangement which the evidence shows to have existed between the defendant and Wyman amounted to anything more than an agreement on the part of the defendant with Wyman to pay Wyman a commission upon all goods which the defendant might carry which should be consigned to it through the influence of Wyman. We do not think it amounted to an agreement with Wyman that they would not go out of business as common carriers at any time they might choose, and that, although they might cease business as common carriers, they should be bound to carry any goods which might thereafter be tendered to them on consignment procured by Wyman. While agreeing with the learned counsel for the plaintiff that a bill of lading of goods is, for many purposes, the symbolical representative of the goods themselves, we do not think that the mere receipt by mail of the

bill of lading of the steamer Charrington of these goods by Messrs. Seligman, Hellman & Co., the defendant's agent at New Orleans, while the defendant was engaged in the business of a common carrier, was equivalent to a receipt of the goods as a common carrier in such a sense as obliged the defendant to transport the goods to their destination at St. Louis, and to assume the risks of a common carrier in such transportation. Neither do we accede at all to the position taken by the learned counsel for the defendant, that at the time these goods arrived in New Orleans, namely, about the 20th of September, 1881, the agency of Seligman, Hellman & Co. for the defendant had been revoked. The record abounds in evidence to the contrary. The telegram of the 10th of September, was not a revocation of their agency, but merely a direction as to how they should proceed to close out the unfinished business of the defendant. The failure to revoke the power of attorney given to Bennett, who was an employe of their New Orleans agents, Seligman, Hellman & Co., indicates a purpose to allow the agency of Seligman, Hellman & Co. to continue so long as should be necessary for the purpose of closing out and winding up the defendant's unfinished business at New Orleans. Then, as late as October, the defendant, in correspondence with the plaintiff touching this shipment, refers to Seligman, Hellman & Co. as their agents. But this question really does not arise upon the record, because the court took the view, as appears from the declaration of law given, that Seligman, Hellman & Co. were, at the time of the arrival of the goods, the defendant's agents.

It will be perceived that the case is made to turn in the opinion of the learned judge upon two views : —

1. That the defendant received the goods, not in the character of a common carrier, but in that of a forwarder.

2. That having received them in the character of a forwarder, it exonerated itself from liability to the plaintiffs

by the exercise of good faith in the premises. We think that neither of these propositions is the law.

1. We think that the defendant received these goods as a common carrier of bonded goods. Unquestionably the goods were tendered to the defendant in this character, and we take it that where goods are tendered to a party in one character, which raises certain duties and liabilities in respect of them, he can not, without the knowledge or consent of the person making the tender, receive them in a different character. This conclusion is so obvious that no other reason need be given for it, than the reason which the appellant's counsel has suggested to us, that it takes two persons to make a bargain. Having then received these goods in their character of carriers of bonded goods, and, being notified by the bill of lading, that they were to be transported in bond, they were bound to transport them in bond if they transported at all; and the taking of them out of bond, and the shipping of them on an unbonded vessel was in law a conversion, and they are liable as matter of law to the plaintiffs for the damages they have sustained. Ang. on Car., sect. 431.

But whether we call it a conversion, or use some other term, the liability of the defendant is the same; for the rule is that the carrier must carry the goods according to the contract. If he engages to carry them by land, he can not carry them by water; nor by water, if he engages to carry them by land; nor by a sail vessel, if he has engaged to carry them by a steam vessel; nor by a particular vessel, if he has engaged to carry them by another vessel. And if in any of these particulars he assumes to violate the shipper's instructions, he takes the risk of loss or damage; and the ground on which he is liable, is that he has not executed his contract with the owner. Hutch. on Car., sects. 314–316; *Goddard* v. *Mallory*, 52 Barb. 87; *Wilcox* v. *Parmalee*, 3 Sandf. 610; *Johnson* v. *Railroad Co.*, 33 N. Y. 610; *Goodrich* v. *Thompson*, 44

N. Y. 324; *Maghee* v. *Railroad Co.*, 45 N. Y. 514; *Bostwick* v. *Railroad Co.*, 45 N. Y. 712; *Sleat* v. *Fagg*, 5 Barn. & Ald. 342.  And when the particular boat upon which the carrier had engaged to transport the goods had gone out of service, even this was held no excuse for shipping them on another boat, for " it was the duty of the defendants to notify the plaintiffs of that fact and await their instructions." *Johnson* v. *Railroad Co., supra.* And that was the duty of the defendant in this case.  And, while on seeing from the bill of lading, that the goods were to be shipped in bond, and not having the means of so shipping them, the defendant might have declined the service, yet having undertaken it, it took upon itself the obligation of shipping them according to its terms, and is liable for the damages which the plaintiffs have sustained by its failure to do so.  *Maghee* v. *Railroad Co., supra.*

2. But if we take the lower view, that the defendant received these goods as forwarders, we are still of opinion that they did not exonerate themselves by the mere exercise of good faith towards the plaintiffs in the premises.  A man who assumes, for a reward, or otherwise, to act for others in a given capacity which implies professional or business knowledge, skill, and judgment, impliedly engages that he will bring to the performance of the duty which he so undertakes that degree of professional or business skill, knowledge, and judgment, which is usually exercised by good undertakers in that particular profession or business. He engages to do more than merely to exercise good faith. He engages to exercise the *diligentia patris familias* of the Roman law, which means the good business skill and diligence which the particular business, or the particular situation requires.  Whar. on Neg., sects. 435–478.

Applying these principles of law to the case of a common carrier who habitually holds himself out as a carrier of bonded goods, it is difficult to see how such carrier can plead, in the light of the evidence contained in this record,

an ignorance of the damage which is done to the salability of wines by shipping them out of bond. The law obliges him to know what competent men engaged in his business generally know ; and if he take a step, with or without this knowledge, in violation of the instructions of the owner of the goods, which step entails substantial loss upon the owner, he is bound to make good such loss. The most that can be said for the defendant's side of the question, upon the assumption that they received the goods in the character of forwarder is, that it would be a question for a jury whether, in doing what they did, under the circumstances disclosed by the evidence, they exercised the good business knowledge, skill, and diligence which belong to that character.

But we rest our judgment upon the ground that they received the goods as carriers, in which character the goods were tendered to them, and in which character the action has been brought against them ; that they received them as carriers of bonded goods, knowing that they were to be shipped in bond; that by taking them out of bond and shipping them upon an unbonded vessel, they became liable to the plaintiffs as for a conversion, although they may have acted in good faith in the premises. The judgment must accordingly be reversed and the cause remanded. It is so ordered. All the judges concur.