**READ–RITE CORPORATION and American Home Assurance Company, Plaintiffs–Appellants,**

v.

**BURLINGTON AIR EXPRESS, LTD.; Cargolux Airlines International, S.A., Defendants–Appellees.**

**No. 98–16962.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 17, 1999.

Decided Aug. 12, 1999.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 27, 1999.

9. The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

David M. Salentine, San Francisco, California, for plaintiffs-appellants.

Michael W. Lodwick, Porter, Groff & Lodwick, Long Beach, California, for defendant-appellee Burlington Air Express.

Stephan E. Kyle (argued), and Ken M. Markowitz, Kenney & Markowitz, San Francisco, California, for defendant-appellee Cargolux Airlines International.

Before: THOMPSON and
FLETCHER, Circuit Judges, and
MOLLWAY, District Judge.[1]

FLETCHER, Circuit Judge:

The question in this case is whether, under federal common law applicable to carriage of goods by air, defendants have successfully limited their liability by contractual provisions in their air waybills.

Plaintiff Read–Rite Corp. ("Read–Rite") contracted with defendants Burlington Air Express Ltd. ("Burlington") and Cargolux Airlines International, S.A. ("Cargolux") to transport by air from England to San Francisco a machine that applies a protective coating to compact discs, called a "cluster sputter." Part of the machine was damaged en route, and Read–Rite and its insurer, plaintiff American Home Assurances Company, sued Burlington and Cargolux in an attempt to recover full compensation for the damages. Burlington and Cargolux argued that their air waybills limited their liability to an amount based on the weight of the damaged portion of the machine. The district court applied English law to Burlington's air waybill and federal common law to Cargolux's air waybill. Summary judgment was entered on behalf of both Burlington and Cargolux, and Read–Rite appeals. We affirm based on federal common law as to both defendants.

### District Court Proceedings

Read–Rite, a California corporation, ordered the cluster sputter from Nordiko, Ltd. ("Nordiko"), a manufacturer in Havant, England. Burlington, a freight forwarder acting on Read–Rite's behalf, arranged for Cargolux to provide air transportation from England to California. Burlington prepared two air waybills, one from itself and one from Cargolux. The air waybill from Burlington identified the place of departure as "Portsmouth," while the other, from Cargolux, identified "London Heathrow" as the place of departure. Both identified the destination as "San Francisco."

The reverse sides of the air waybills set forth the terms of carriage. Both air waybills limited the liability of the carrier. Burlington's liability was limited to the lesser of the value of the damaged goods, or "two Special Drawing Rights as defined by the International Monetary Fund ... per kilo of gross weight of any goods lost or damaged"; Cargolux's liability was limited to $20 per kilogram of the damaged package.

Because of the cluster sputter's size and weight, it was broken down and shipped in ten separate crates. The crates were picked up from Nordiko's facility at Havant and taken by truck to Burlington's facility near Heathrow Airport. The crates were weighed there and then transferred by truck to the Cargolux facility near, but not within the perimeter of, Heathrow Airport. At the Cargolux facility, a ground handling agent accidentally damaged one of the crates and the machinery within. The nine undamaged crates continued to California without interruption, but the damaged part of the cluster sputter was returned to Nordiko for repairs. It eventually arrived in San Francisco four days after the first nine crates.

Despite what was written on the air waybills, the cluster sputter did not leave Heathrow Airport by airplane. The actual arrangement was shipment by truck to Dover, England, by ferry to Calais, France, by another truck on the continent, and finally by air to San Francisco from Luxembourg. Read–Rite claims that all of these stops and the "deceit" of the air waybill listing Heathrow rather than Luxembourg as the "place of departure" violated the treaty known as the Warsaw

1. Honorable Susan Oki Mollway, United States District Judge for the District of Hawaii, sitting by designation.

Convention. Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (1934), note following 49 U.S.C. § 40105. The district court held that the Warsaw Convention does not apply to this case because Article 18(3) of the Convention states that it "shall not extend to any transportation by land, by sea or by river performed outside an airport."

Because the Warsaw Convention does not apply, this case is governed by the air waybills issued by Burlington and Cargolux. Although neither Read–Rite nor Burlington invoked it, Burlington's air waybill contained a choice-of-law provision requiring application of English law. Cargolux's air waybill had no choice-of-law provision. At the hearing on summary judgment, the district court believed that limited liability for Burlington was appropriate but expressed doubt that federal common law would allow that result because Read–Rite had not seen Burlington's air waybill prior to shipment. The district court found a way out of the dilemma by holding the limitation of liability clause enforceable under English law. The problem for Cargolux was somewhat easier because Burlington, acting as Read–Rite's agent, had seen (indeed, had prepared) the Cargolux air waybill prior to shipment. The district court relied on English law in granting summary judgment for Burlington, and on federal common law in granting summary judgment for Cargolux.

## Discussion

### I. The Warsaw Convention

 The Warsaw Convention is an international treaty governing the liability of air carriers engaging in international air travel (note following 49 U.S.C. § 40105). The Convention's scope is limited by Article 18:

> (1) The carrier shall be liable for damage sustained in the event of the destruction or loss of, or damage to, any checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air.

> (2) The transportation by air within the meaning of the preceding paragraph shall comprise the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft, or, in the case of a landing outside an airport, in any place whatsoever.

It is undisputed that the goods in this case were destroyed during ground transportation that was close to—but clearly outside—London's Heathrow Airport.[2] We agree with the district court that, by the plain terms of Article 18, the Warsaw Convention does not apply. *See Victoria Sales Corp. v. Emery Air Freight, Inc.*, 917 F.2d 705, 707 (2d Cir.1990).

Read–Rite attempts to avoid the plain language of Article 18 by emphasizing the "deceit" of the air waybill. The face of Cargolux's air waybill indicated that the cargo would be flown out of Heathrow, but in fact, Cargolux flew it out of Luxembourg. Read–Rite argues that it had no notice that the cargo would be shipped by this route. Read–Rite might have a viable argument if the damage to the cluster

2. Where there is some conflict over whether the damage occurred during air transportation, Article 18(3) creates a rebuttable presumption that the damage occurred during air transportation, thus making the Warsaw Convention applicable "subject to proof to the contrary." Article 18(3) provides: "The period of the transportation by air shall not extend to any transportation by land, by sea or by river performed outside an airport. If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air." Article 18(3) does not apply in this case because there is "proof to the contrary," showing clearly that the damage did not occur during air transportation.

sputter had occurred during an undisclosed and unforeseeable ferry trip across the English Channel. But we leave that question for a case in which it is presented. In this case, the damage occurred when the crates arrived at the Cargolux facility near Heathrow, a portion of the transportation that was entirely predictable and would have occurred whether the cargo was flown out of Heathrow or any other airport.

## II. Federal Common Law

■ The district court followed English law in construing Burlington's air waybill, although neither Burlington nor Read–Rite had sought its application. Similarly, in this court, neither Read–Rite nor Burlington argues that English law should be applied. Read–Rite, Burlington, and Cargolux believe, and we agree, that in the absence of the Warsaw Convention federal common law governs the construction of both the Burlington and Cargolux air waybills. *See Deiro v. American Airlines, Inc.,* 816 F.2d 1360, 1364 (9th Cir.1987).

■ Although settings in which federal common law is applied are "few and restricted," application of federal common law is appropriate where there is a "significant conflict between some federal policy or interest and the use of state law." *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (internal quotation omitted). We have previously held that federal common law applies to the carriage contract of an air carrier, holding that the "deregulation of air carriers in 1978 did not change the applicability or substantive content of the relevant federal common law." *Deiro,* 816 F.2d at 1365; *see* Airline Deregulation Act of 1978, 49 U.S.C. § 40120(c). However, the Supreme Court's decision in *O'Melveny & Myers,* as well as our own recent decisions regarding federal preemption of state law applied to air carriers, *see, e.g., Charas v. Trans World Airlines, Inc.,* 160 F.3d 1259 (9th Cir.1998) (en banc), suggest

the desirability of our reviewing here the basis for applying federal common law to actions arising from loss or damage to cargo shipped by an air carrier.

The Court of Appeals for the Fifth Circuit in *Sam L. Majors Jewelers v. ABX, Inc.,* 117 F.3d 922, 926–29 (5th Cir.1997), exhaustively canvassed the history of federal common law applied to common carriers, of federal regulation of air carriers, and of the eventual deregulation of air carriers. The court in *Sam L. Majors Jewelers* reached two conclusions. First, a cause of action against air carriers for lost or damaged goods is "clearly established" under federal common law. *Id.* at 928. Second, a state law cause of action against an air carrier for lost or damaged goods is preempted by the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b)(1). *Id.* at 931. We consider these conclusions in turn.

■ First, we agree with the Fifth Circuit that federal common law applies to loss of or damage to goods by interstate common carriers by air. *Deiro,* 816 F.2d at 1365. In the late 1800s, regulation of the railroads, the most important common carrier of the time, was primarily by common law. In cases tried in the state courts, state courts were free to apply their own common law rules governing limited liability. As the Supreme Court noted in 1903, such state court "cases [were] numerous and conflicting" with "different rules prevailing in different States," but in the absence of federal statutory regulation state courts were free to apply these varying state rules. *Pennsylvania R.R. v. Hughes,* 191 U.S. 477, 486, 24 S.Ct. 132, 48 L.Ed. 268 (1903). Federal trial courts, by contrast, applied a uniform rule of general common law under the regime of *Swift v. Tyson,* 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842). As the Court stated in *Hughes,* "[f]ederal courts in cases of which they have jurisdiction will doubtless continue to follow the [general common law] rule of the *Hart* case." *Id.*[3]

---

3. One of the most well-established general common law rules at the time, which later evolved into a rule of federal common law,

By the end of the century, however, federal law began to supersede state regulation. In 1887, Congress passed the Interstate Commerce Act, 24 Stat. 379, and nineteen years later passed the Hepburn Act, 34 Stat. 584, both of which regulated railroads. The Hepburn Act contained a provision known as the Carmack Amendment, which, as later interpreted by the Supreme Court, entirely preempted state regulation of common carriers. *Adams Express Co. v. Croninger,* 226 U.S. 491, 505, 33 S.Ct. 148, 57 L.Ed. 314 (1913). After the passage of the Carmack Amendment, the Supreme Court continued to follow the old general common law rules concerning limitations of liability, but transformed them into rules of federal common law binding in state courts as well as federal courts. *See, e.g., Boston & Maine R.R. v. Piper,* 246 U.S. 439, 444, 38 S.Ct. 354, 62 L.Ed. 820 (1918) (applying federal common law rule of limitation of liability in a case originating in Vermont state court). Air travel barely existed at the time of the Carmack Amendment and *Adams Express,* but common carriers by air were eventually regulated under a regime similar to that of the railroads: federal regulation by statute, federal preemption of state regulation, and regulation by federal common law of matters not covered by federal statute.

Since 1938, three significant federal statutes have regulated (and later deregulated) common carriers by air: the Civil Aeronautics Act of 1938, 52 Stat. 973 ("CAA"); the Federal Aviation Act of 1959, 72 Stat. 731 ("FAA"); and the Airline Deregulation Act of 1978, 92 Stat. 1705 ("ADA"). These three Acts have always had "savings provisions" preserving remedies at common law. For example, the FAA preserved "the remedies now existing at common law or by statute...." 49 U.S.C.App. § 1506 (1988). Although the FAA did not address whether a carrier could include a contractual provision completely exculpating the carrier from liability, we have held that the federal common law invalidating such provisions governs. *See Klicker v. Northwest Airlines, Inc.,* 563 F.2d 1310, 1314 (9th Cir.1977) ("We refuse to impute to Congress an intent to abrogate silently this area of the common law by omitting to single it out for honorable mention at the same time that it expressly incorporated the entire federal common law applicable to carriers in Section 1106."). The savings provision of the FAA was re-enacted in 1994. It now simply states that "remedies provided by law" are preserved, but this change was not intended to have any substantive effect. 49 U.S.C. § 40120(c). In *Deiro,* we held that the ADA did not affect the savings provision's preservation of federal common law remedies. *Deiro,* 816 F.2d at 1365; *accord Sam L. Majors Jewelers,* 117 F.3d at 929; *First Pennsylvania Bank v. Eastern Airlines,* 731 F.2d 1113, 1122 (3d Cir. 1984).

■ Nothing in the Supreme Court's discussion of federal common law in *O'Melveny & Myers* suggests that we decided *Klicker* and, more recently, *Deiro* incorrectly. The Court noted that federal common law is "limited to situations where there is a significant conflict between some federal policy or interest and the use of state law." *O'Melveny & Myers,* 512 U.S. at 87, 114 S.Ct. 2048 (internal quotation marks omitted). Further, the Court "re-

was the rule of *Hart v. Pennsylvania R.R. Co.,* 112 U.S. 331, 337–38, 5 S.Ct. 151, 28 L.Ed. 717 (1884) (holding that common carriers may contractually limit liability to a fixed amount but may not entirely exempt themselves from liability). Conflicts between the general common law applied in federal courts and the common law applied in state courts would eventually result in the elimination of the general common law. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.

1188 (1938). But *Erie* did not eliminate federal common law, a species of federal law that must be applied by both federal and state courts. "As has been frequently noted, the same day *Erie* was decided, the Supreme Court released an opinion in which Justice Brandeis, the author of *Erie,* relied upon federal common law to resolve a case." *Sam L. Majors Jewelers,* 117 F.3d at 927 n. 8 (citing *Hinderlider v. La Plata River Co.,* 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938)).

quire[s] the existence of such a conflict as a precondition for recognition of a federal rule of decision." *Id.* Finally, federal common law must be "[t]ethered to a genuinely identifiable (as opposed to judicially constructed) federal policy." *Id.* at 89, 114 S.Ct. 2048. The federal common law we applied in *Deiro* meets these requirements. Even before Congress announced a federal policy preempting state regulation of air carriers with the ADA, we noted that "[f]ederal common law, rather than state law[,] may be applicable by reason of an overriding federal interest in the uniformity of obligations of domestic air carriers." *Klicker,* 563 F.2d at 1316 n. 10. After the enactment of the ADA, the ADA's preemption clause is clear evidence of a "significant conflict" between a federal policy and the use of state law. *See Sam L. Majors Jewelers,* 117 F.3d at 929 n. 14 ("[B]y enacting the ADA's preemption clause ... Congress has placed a statutory imprimatur upon federal common law in the limited circumstance of this case."). The ADA's savings provision is further evidence that we apply federal common law in this case "[t]ethered to a genuinely identifiable (as opposed to judicially constructed) federal policy." *O'Melveny & Myers,* 512 U.S. at 89, 114 S.Ct. 2048.

■ Second, we agree with the Fifth Circuit that state law regulating the scope of air carrier liability for loss or damage to cargo is preempted by the ADA. *See Sam L. Majors Jewelers,* 117 F.3d at 929 n. 15, 931; *see also Deiro,* 816 F.2d at 1365 (applying federal common law). The ADA provides that states may not "enact or enforce a law, regulation, or other provision having the force and effect of law relating to a price, route, or service of an air carrier...." 49 U.S.C. § 417 13(b)(1). The Supreme Court has held that the application of state contract law to "routine breach-of-contract claims" is not preempted by the ADA. *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 232, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). The Court explained that Congress never intended "to channel into federal courts the business of resolving, pursuant to judicially fashioned

federal common law, the range of contract claims relating to airline rates, routes or services." *Id.* Following *Wolens,* we have recently held that in adopting the ADA "Congress did not intend to preempt passengers' run-of-the-mill personal injury claims" related to "in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." *Charas v. Trans World Airlines, Inc.,* 160 F.3d 1259, 1261 (9th Cir.1998) (en banc). Such "services" are only related to the purpose of federal airline deregulation in a "peripheral manner." *Id.* at 1265 (quoting *Morales v. Trans World Airlines,* 504 U.S. 374, 390, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)).

But a court deciding when air carriers may contractually limit their liability for loss of or damage to shipped cargo faces neither a "routine" contract claim, as was presented in *Wolens,* nor "run-of-the-mill" injury claims, as were presented to us in *Charas.* In *Wolens,* the Court stated:

> The ADA's preemption clause ... read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated. This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement.

*Wolens,* 513 U.S. at 232–33, 115 S.Ct. 817. Deciding whether a limited liability provision is enforceable is a matter of "substantive standards" and "policies external to the agreement." Once it is determined that a limited liability clause is enforceable under federal common law, then the precise content of the contractual clause is a matter of "the parties' bargain" to which state contract law applies.

Further, preempting state law with respect to the permissible scope of limited liability promotes the goals of airline deregulation. Even before the passage of the ADA, we speculated that divergent state law rules governing liability for lost or damaged air cargo conflict with federal policies. *Klicker*, 563 F.2d at 1316 n. 10. The ADA now plainly states the federal policy noted in *Klicker* and applied in *Deiro*. The scope and standard of limited liability of an air carrier for loss or damage to cargo are directly related to the carrier's rates and services, and go to the very heart of the ADA. Allowing states to decide individually when and how a common air carrier may limit its liability would "significantly impact federal deregulation," *Charas*, 160 F.3d at 1265, and would "adversely affect the economic deregulation of the airlines and the forces of competition within the airline industry," *id.* at 1261. Because the imposition of state standards to decide whether contractual limits on liability are enforceable is contrary to the language, intent, and purpose of the federal policy embodied in the ADA, we apply federal common law to this question.

 Under established federal common law, if a carrier wishes to enforce a limited liability provision, its contract must offer the shipper (1) reasonable notice of limited liability, and (2) a fair opportunity to purchase higher liability. *See Deiro*, 816 F.2d at 1364. Limited liability provisions are prima facie valid if the face of the contract (or, in this case, air waybill) recites the liability limitation and "the means to avoid it." *See Royal Insurance Co. v. Sea–Land Service Inc.*, 50 F.3d 723, 727 (9th Cir.1995). The burden then shifts to the shipper to prove that it did not have a "fair opportunity" to purchase greater liability coverage. *Id.*

 The Burlington air waybill recites the liability limitation, stating that liability will be the lesser of the value of the damaged goods, or "two Special Draw-

ing Rights as defined by the International Monetary Fund per kilo of gross weight of any goods lost or damaged." Read–Rite stresses that it never saw the contract until after the damage had occurred. But this court has previously held that "actual possession of the bill of lading with the [liability] limit is not required before a party with an economic interest in the shipped goods can be held to the limitation." *Royal Insurance Co.*, 50 F.3d at 727.

 The function of the federal common law rule requiring notice of limited liability is to ensure that the shipper has an opportunity to make an informed choice between, on the one hand, shipping at a lower cost with limited liability, and, on the other, separately purchasing insurance or shipping at a higher cost without limited liability. Under the federal common law of our circuit, the function served by notice of limited liability is accomplished if the shipper in fact purchases separate insurance, whether or not such notice is actually given. The decision to insure separately "in and of itself demonstrates ... a conscious decision not to opt out of the liability limitation." *Vision Air Flight Service v. M/V National Pride*, 155 F.3d 1165, 1169 (9th Cir.1998); *see also Travelers Indemnity Co. v. The Vessel Sam Houston*, 26 F.3d 895, 900 (9th Cir. 1994); *Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 901 n. 10 (9th Cir.1989). The separate purchase of insurance simply cannot be reconciled with a contention that the shipper has been disadvantaged by a lost opportunity to pay the carrier more money in return for greater coverage.[4] As we explained in *Travelers Indemnity*, "[w]hy would [the shipper] increase its costs by insuring the same cargo twice?" 26 F.3d at 900. Be-

---

4. We are aware that insurance rates will reflect the possibility of recovery in subrogation. The insurer merely stands in the shoes of the shipper, however, and cannot argue as if the shipper did not make the decision to insure separately.

cause Read–Rite did, in fact, separately purchase insurance covering damage to the cluster sputter during shipment, it is clear that the limitation of liability provision in the Burlington waybill is valid and enforceable against Read–Rite.

▮▮▮ The limitation of liability provision in the Cargolux air waybill is also enforceable against Read–Rite for two independently sufficient reasons. First, Burlington, acting as Read–Rite's agent, saw the air waybill (and its limitation of liability provision) before shipment. Thus, there was actual notice of the sort contemplated in our decision in *Deiro*, 816 F.2d at 1364. Second, as we know from the previous discussion, Read–Rite's purchase of separate insurance achieves the purpose of notice even if that notice was not actually provided.

Summary judgment enforcing the limited liability provisions of both Burlington's and Cargolux's air waybills was thus properly granted.

### III. Measure of Damages

Read–Rite maintains that, though the cluster sputter machine was broken down for shipment into ten separate crates, damage to any one crate is damage to all ten crates for purposes of calculating liability under the air waybills. Therefore, Read–Rite argues, the relevant weight is the weight of all ten crates, not the weight of the single damaged crate. The district court believed, and we agree, that this argument is inconsistent with a fair construction of the language in the air waybills applied to the facts of this case.

▮▮▮▮ Both air waybills establish a liability scheme based on the weight of the cargo. Cargolux's air waybill provides that "the weight to be taken into account

in determining Carrier's limit of liability shall be *only the weight of the package or packages concerned*" (emphasis added). By referring to the "package or packages concerned," the Cargolux contract clearly contemplates that shipments may consist of multiple packages, and that only the damaged individual packages are the measure of damages. Burlington's air waybill calls for limited liability calculated on the basis of "two Special Drawing Rights as defined by the International Monetary Fund per kilo of *gross weight of any goods lost or damaged*" (emphasis added). Burlington's contract does not address the factual situation presented in this case as clearly as the Cargolux contract, but we nonetheless find that it limits liability to the weight of the single damaged crate. The damaged portion of the machine was confined to the single crate that was damaged, and the crate containing the damaged portion was returned to the factory while the rest of the machine was shipped to San Francisco. After prompt repairs, that portion arrived in San Francisco only four days after the first nine crates.[5]

### IV. Discovery Sanctions

▮▮▮ Read–Rite moved under Fed. R.Civ.P. 37(c)(2) for discovery sanctions against Cargolux. The premise of Read–Rite's motion was that it was forced to travel to England to depose various witnesses because Cargolux had been evasive in responses to requests for admissions. After the district court granted summary judgment to Burlington and Cargolux, the magistrate judge denied the sanctions motion because the requests were not of substantial importance to the litigation; because Read–Rite should have moved to compel sufficient responses before incur-

---

**5.** We believe that Read–Rite's reliance upon the reasoning in *Deere & Co. v. Deutsche Lufthansa Aktiengesellschaft*, 621 F.Supp. 721 (N.D.Ill.1985), is misplaced. First, *Deere & Co.* is a Warsaw Convention case depending for its result on the language of the Convention, whereas the result in this case depends on the language contained in the air waybills. Second, *Deere & Co.* involved damage to the "director frame" of a computer, which rendered the entire computer inoperable for several months—a situation where damage to a part was more plausibly understood as damage to the whole machine. *Id.* at 722. Because the reasoning of *Deere & Co.* does not apply to this case, we need not decide whether it was correctly decided.

ring the expense of a trip to England; and because Read–Rite "made no attempt to identify—whether in [its] moving papers, [its] reply, or [its] supplemental brief—that portion of the costs of the England depositions that is properly attributed to Cargolux's failure to make the requested admissions." We review the denial of sanctions for an abuse of discretion, *see Murdock v. Stout,* 54 F.3d 1437, 1444 (9th Cir.1995), and find no abuse.

**AFFIRMED.**