Mark KESEL, Plaintiff–Appellant,

v.

UNITED PARCEL SERVICE, INC.; UPS Airlines, Inc.; UPS Customhouse Brokerage, Inc., Defendants–Appellees.

No. 02–15329.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 2003.

Filed Aug. 4, 2003.

Paul McCarthy, Oakland, California, for the appellant.

Paul T. Friedman and Ruth N. Borenstein, Morrison & Foerster LLP, San Francisco, California, for the appellees.

Before FERGUSON, McKEOWN, and RAWLINSON, Circuit Judges.

Opinion by Judge McKEOWN; Dissent by Judge FERGUSON

## OPINION

McKEOWN, Circuit Judge.

A package of paintings by prominent Ukrainian artists, en route from Odessa to California via United Parcel Service, arrived at a Kentucky warehouse, then vanished like the Ark of the Covenant.[1] The shipper, Mark Kesel, contends that the paintings were worth far more than the $558 declared value listed on the waybill, and seeks to hold United Parcel Service and UPS Custom Brokerages, Inc., (collectively, "UPS") liable for the full value of the paintings.

We must decide whether UPS violated the released valuation doctrine, which requires carriers to give interstate shippers reasonable notice of limited liability and a fair opportunity to buy more insurance. UPS provided notice of its limited liability ($100 per shipment) in the documents that constituted its shipping contract. Although Kesel, through his agent, was able to purchase insurance in excess of the limitation, UPS rebuffed the agent's attempt to insure the paintings for more than their value as stated on a Ukrainian customs form. The district court, on summary judgment, concluded that UPS complied with the released valuation doctrine, and limited its liability to $558. We agree and affirm.

## BACKGROUND

Kesel is a corporate executive in the high technology arena and a sponsor of a foundation that distributes fine art from Russia and the Ukraine. During a trip to the Ukraine, Kesel and an Odessa-based artist, Sergei Belik, visited studios and selected seven paintings for an exhibition that the foundation planned to hold in San Francisco.

Before leaving Odessa, Kesel asked Belik to ship the paintings to California

---

1. We refer to the film, *Raiders of the Lost Ark* (Paramount Pictures 1981), in which the government, much to the chagrin of Indiana Jones, decided that placing the Ark inside a crate amid a giant warehouse filled with identical crates was the best way to ensure that it would never be found.

through UPS. He told Belik to declare the paintings at $13,500 for U.S. customs purposes and to insure them for $60,000, a figure based on Kesel's belief that the paintings could be sold in the United States for $8,000 to $10,000 apiece.

As required by Ukrainian law, Belik took the paintings to the customs commission in Odessa. According to Belik, if the commission decides that a work of art is not an antique, it does not estimate its artistic worth, but instead assigns a value based on the cost of materials. Belik paid the customs duties and the commission gave him a permit form that listed the value of the paintings as $558.

Belik took the customs form and the paintings to the UPS office in Odessa. He told the UPS clerk that he wanted to insure the paintings for $60,000. After consulting by phone with a central office, the UPS clerk "categorically refused" to insure the paintings for more than $558. Belik, without contacting Kesel, went ahead and shipped all seven paintings in a single package. On the waybill, the value "$558" appears in the box entitled "Declared Value for Insurance." Belik filled in the addresses on the waybill and signed it.

When the paintings did not arrive in California, Kesel called UPS, which traced the package to its international warehouse in Kentucky. Further efforts to locate the paintings failed, however, and they are presumed to be lost.

Kesel sued UPS in California court, alleging numerous federal and state claims, and seeking $60,000 in damages for the loss of the paintings. After UPS removed the case to federal court, Kesel amended his complaint to allege claims for negligence and breach of contract under federal common law, which governs contractual clauses limiting the liability of interstate carriers for damage to goods shipped by air. *See King Jewelry, Inc. v. Fed. Express Corp.*, 316 F.3d 961, 964 (9th Cir. 2003).

The district court granted summary judgment for UPS, limiting its liability to $558. The court concluded that UPS had satisfied the released valuation doctrine. UPS's shipping contract provided reasonable notice of limited liability, the court reasoned, because the waybill and other documents informed the shipper that UPS would not be liable for more than the $100 per package "released value" unless the shipper declared a higher value on the waybill. Although these shipping documents imposed an upper limit of $50,000 on this additional insurance, the court concluded that UPS had given Kesel a fair opportunity to purchase greater liability because Belik insured the paintings for $558—more than the $100 released value that otherwise would have applied.

## DISCUSSION

### I. THE BELIK DECLARATION

As a preliminary matter, Kesel argues that the district court erroneously excluded Belik's declaration. The district court concluded that Kesel had failed to lay a proper foundation for the declaration because he provided "no explanation about how the document was translated, who that translator was, or the expertise of the translator." We review this evidentiary decision for an abuse of discretion and may not reverse "absent some prejudice." *Wendt v. Host Intern., Inc.*, 125 F.3d 806, 810 (9th Cir.1997) (citation omitted). Here, we need not consider whether the district court abused its discretion because Kesel does not point to any prejudice from the purported error and acknowledges that the district court permitted the admission of Belik's deposition transcript in lieu of the declaration. The transcript contains

all of the pertinent testimony and information that appears in the declaration and, as the district court noted, the declaration would not have changed its decision. Thus, we consider the evidence offered in Belik's deposition in evaluating this summary judgment case on appeal.

## II. THE RELEASED VALUATION DOCTRINE

■ Whether Kesel can recover more than the $558 declared value for the lost paintings is an issue of federal common law that we review de novo. *See King Jewelry*, 316 F.3d at 965; *Milne Truck Lines v. Makita U.S.A., Inc.*, 970 F.2d 564, 567 (9th Cir.1992) (holding that "the construction of a tariff ... presents a question of law for the court to resolve.") (citations omitted). The essential facts regarding the shipment are not in dispute. "The released valuation doctrine, a federal common law creation, delineates what a carrier must do to limit its liability." *Id.*[2] Under this doctrine, in exchange for a low rate, the shipper "is deemed to have released the carrier from liability beyond a stated amount." *Deiro v. American Airlines*, 816 F.2d 1360, 1365 (9th Cir.1987).

■ UPS can limit its liability to $558 only if it provided Kesel with "(1) reasonable notice of limited liability, and (2) a fair opportunity to purchase higher liability." *Read–Rite Corp. v. Burlington Air Ex-*

*press, Ltd.*, 186 F.3d 1190, 1198 (9th Cir. 1999) (citation omitted); *see also Deiro*, 816 F.2d at 1365 ("[T]he shipper is bound only if he has reasonable notice of the rate structure and is given a fair opportunity to pay a higher rate in order to obtain greater protection.") (citations omitted).

UPS's shipping agreement with Kesel comprised the air waybill that Belik signed, the Guide to UPS Services (the "Service Guide"), and UPS's General Tariff Containing Classifications, Rules and Practices for the Transportation of Property (the "Tariff"). *See King Jewelry*, 316 F.3d at 964 (noting that the airbill and Service Guide formed the contract between the shipper and FedEx). As we discuss below, because these documents gave Kesel reasonable notice of limited liability, and UPS gave Kesel a fair opportunity to purchase greater liability coverage, the district court properly limited UPS's liability to the amount stated on the waybill.[3]

### A. NOTICE OF LIMITED LIABILITY

■ UPS's waybill, Service Guide, and Tariff each contain "prominent notices of the liability limitation in plain language." *King Jewelry*, 316 F.3d at 966. For example, the front of the waybill instructs the reader in bold type to "See Instructions On Back." The reverse side of the waybill

---

**2.** We agree with the district court that the Warsaw Convention, "an international treaty governing the liability of air carriers engaging in international air travel," does not apply to Kesel's claims. *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1185 (9th Cir.2002) (internal quotation marks and citation omitted); *see* Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (1934), *reprinted in* note following 49 U.S.C. § 40105 (the "Warsaw Convention"). Kesel alleges that the package disappeared, not during the flight from Odessa to the United States, but after it arrived at

UPS's Kentucky warehouse. Federal common law governs liability limits on shipments by air within the United States. *See Wayne*, 294 F.3d at 1185.

**3.** We note that although Kesel hoped to recover $60,000, the projected amount that the paintings would have sold for in the United States, the district court held that UPS's Tariff barred the recovery of such consequential damages. Kesel did not appeal this ruling. We therefore limit our analysis to whether Kesel may recover the actual value of the paintings.

explains that "any liability of UPS shall be ... limited to proven damages up to a maximum per shipment of the local currency equivalent of USD 100 per shipment, unless a higher value has been declared...." UPS's Service Guide and Tariff both contain similar language.[4]

Kesel does not dispute the presence of the limited liability language on the shipping documents. Rather, he argues that he lacked notice of UPS's liability limitation because the waybill and other materials are written in English—which Belik cannot read—and the back of the waybill was smudged. Also, according to Kesel, he and Belik misunderstood the purpose of the insurance they sought to buy from UPS, mistakenly believing that it would provide them with additional protection above and beyond UPS's liability for the full value of the paintings.

Despite an effort to suggest he was duped, Kesel cannot escape the broad reach of our precedent regarding notice of limited liability: "[F]ederal common law has never required actual notice of a carrier's liability limitation." *Deiro*, 816 F.2d at 1366 (citation omitted). Nor is "actual possession of the bill of lading with the [liability] limit ... required before a party with an economic interest in the shipped goods can be held to the limitation." *Read–Rite*, 186 F.3d at 1198 (quoting *Royal Ins. Co. v. Sea–Land Service, Inc.*, 50 F.3d 723, 727 (9th Cir.1995)) (internal quo-

tation marks omitted) (alteration in the original). Kesel, who is fluent in English and had previously shipped expensive items through UPS—such as electronic equipment insured for up to a million dollars—knew how to find out the extent of UPS's liability. *Cf. Deiro*, 816 F.2d at 1365 (noting that "an experienced commercial air traveler" had "ample opportunity to become familiar" with the carrier's liability limitation). Whatever their alleged naivete in matters of international shipping, it would be "unfair to place the loss" on UPS merely because Belik or Kesel now claim to have "misunderstood the effect of the liability limitation commonly used by interstate carriers." *Norton v. Jim Phillips Horse Transp., Inc.*, 901 F.2d 821, 830 (10th Cir.1989). Such a result would effectively spell the death knell for liability limitations in interstate shipping and dramatically alter the fairly settled landscape that defines the relationship between the shipper and the carrier.

### B. Fair Opportunity To Purchase Additional Liability Coverage

The heart of Kesel's case is that UPS denied him a fair opportunity to purchase greater liability coverage because it refused to let Belik insure the paintings for more than $558—a fraction of the $50,000 maximum listed in UPS's waybill, Service Guide, and Tariff.[5] Although this argu-

---

**4.** The Service Guide states that, "[u]nless a greater value is declared in writing in the space provided on the shipping record provided to the carrier, the shipper declares the released value of each shipment to be no greater than $100 (U.S.)." The Tariff provides that "[t]he maximum liability per package assumed by UPS is limited to the lesser of: i) $100, or ii) actual cost of the loss or damage sustained."

**5.** The back of UPS's waybill provides that "[t]he shipper may obtain coverage in excess of UPS's limit of liability by declaring a high-

er value in writing on the face of the waybill and paying an additional charge, as stated in the Tariff Guide." UPS's Guide to Services states that the shipper "can obtain additional coverage up to $50,000 per package.... To insure a package having a value greater than $100, show the full value in the Declared Value field as appropriate to your UPS shipping system." The Tariff notes that "[t]he maximum liability per package assumed by the applicable insurance company shall not exceed $50,000 regardless of the value in excess of the maximum."

ment seemingly has appeal, it is inconsistent with *King Jewelry*, in which we held that "the released valuation doctrine only requires a fair opportunity to purchase a higher liability, not necessarily up to the full value of the item." 316 F.3d at 966 (citations omitted). UPS in fact did allow Belik to buy insurance for more than the standard $100 per package limit that otherwise would have applied.

In *King Jewelry*, the plaintiff shipped marble candelabra through FedEx and attempted to insure them for their full $37,000 value. *Id.* When the candelabra were damaged during shipment, FedEx sought to limit its liability to $500, which the waybill stated was the maximum liability for "items of extraordinary value." *Id.* at 963. We held that FedEx was liable only for $500, and that it had complied with the released valuation doctrine by insuring the candelabra for that amount— less than their actual value, but higher than the $100 released value. *Id.* at 966.

Kesel likens his situation to a case in which the carrier altogether refused to give shippers the opportunity to buy additional insurance. *See Klicker v. Northwest Airlines*, 563 F.2d 1310, 1312 (9th Cir. 1977). In *Klicker*, the shippers informed the Northwest Airlines' ticket agent that their dog was worth $35,000, but the agent would not permit them to declare any value for the dog or buy any additional coverage. *Id.* The dog died during the flight. We held that the airline was liable for the entire value of the dog, and that the airline could not rely on its tariff provision that limited recovery to $500 in the absence of a declared value. *Id.* at 1316. Kesel's case, however, presents a different scenario. In contrast to the airline in *Klicker*, UPS permitted Belik to declare a value for

the paintings and to insure them for the declared value.

UPS does not have carte blanche to impose arbitrary limits, irrespective of its Tariff and waybill, on the insurance it offers to shippers. Nonetheless, in the context of its dual role as customs agent and carrier, UPS complied with its Tariff and shipping agreement in limiting available insurance to the value listed on the customs documents. The Service Guide explains that, for international shipments, the shipper must "provide required documentation for customs clearance ... By providing required documentation, the shipper certifies that all statements and information relating to exportation and importation are true and correct." According to the Guide, UPS requires the shipper to submit an invoice listing, among other things, the "total value of each item," and the shipper appoints UPS as "the agent for performance of customs clearance, where allowed by law."

Given these shipment guidelines and the circumstances of Kesel's shipment, UPS complied with the released valuation doctrine in limiting the insurance to the value listed on the form presented with the paintings. This procedure did not deprive Kesel of proper notice. Belik admits that the UPS agent clearly told him that it would not insure the paintings for more than the customs value, and Belik, without consulting Kesel, chose to ship through UPS fully aware of the limited liability. Nothing here supports a claim of coercion or misinformation.

The opportunity to purchase additional liability coverage from UPS was fair and it did not leave Belik in the lurch. Belik could have bought separate insurance elsewhere or shipped with a different carrier.[6]

---

**6.** The dissent's suggestion that the availability of separate insurance is irrelevant misreads

*Read–Rite.* The purpose of the released valuation doctrine is to guarantee the shipper "an

Instead, Belik shipped the paintings through UPS, aware that he had only purchased $558 worth of liability, but hoping "in this particular case everything would be as normal." Through his agent, Kesel took the gamble that the paintings would not vanish. When they did, he was stuck with the bargain he struck—UPS's liability is limited to the $558 declared value stated on the waybill.[7]

**AFFIRMED.**

FERGUSON, Circuit Judge, dissenting.

I respectfully dissent. The majority misconstrues our decision in *King Jewelry, Inc. v. Fed. Express Corp.*, 316 F.3d 961, 966 (9th Cir.2003), effectively permitting common carriers to manipulate their rate structures by adding unpublished terms to their tariffs at the time of shipment. Even more troubling, the majority holds that a shipper has presumptively been afforded a fair "opportunity to purchase additional coverage" anytime she "could have bought separate insurance elsewhere or shipped with a different carrier." Maj. Op. at 854–855. In other words, after this decision, a carrier may comply with the requirements of the released valuation doctrine by posting a sign listing some (but not all) of their terms and doing business in a location where there are other carriers or third-party insurance providers. This evisceration of the protection afforded by the released valuation doctrine is unwarranted and unwise. Because I believe that, construing the facts in the light most favorable to Kesel, UPS did not provide a "fair opportunity" to purchase greater liability coverage, I must dissent.

As the majority recognizes, under the released valuation doctrine,

> [a common] carrier can lawfully limit recovery to an amount less than the actual loss sustained only if it grants its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge ... [T]he shipper is bound only if he has reasonable notice of the rate structure and ... a fair opportunity to pay the higher rate in order to obtain greater protection.

*Deiro v. Am. Airlines, Inc.*, 816 F.2d 1360, 1365 (9th Cir.1987) (internal citations omitted). The purpose of the released valuation doctrine "is to ensure that the shipper has an opportunity to make an informed choice between ... shipping at a lower cost with limited liability, and, on the other, separately purchasing insurance or shipping at a higher cost without limited liability." *Read–Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1198 (9th Cir.1999). "Limited liability provisions are prima facie valid if the face of the[air waybill] ... recites the liability limitation and 'the means to avoid it.'" *Id.* (citing

---

opportunity to make an informed choice between ... shipping at a lower cost with limited liability ... and separately purchasing insurance *or* shipping at a higher cost without limited liability." *Read–Rite*, 186 F.3d at 1198 (emphasis added). Just as the purchase of separate insurance tends to show notice of limited liability, *see id.*, the availability of such insurance shows that the shipper had a fair opportunity to purchase greater liability. Here, Kesel had the full range of choices: he could have accepted the released value, bought insurance from UPS for the customs value, or bought separate insurance for what he believed to be the actual value.

**7.** Kesel argues that the district court should not have entered judgment for UPS because he is at least entitled to the $558 declared value on the waybill. The district court's judgment does not prevent Kesel from recovering the $558 because the order explicitly fixed UPS's liability at that amount. Kesel also claims that the district court unfairly awarded costs to UPS, but Kesel did not challenge the cost award in the district court, and he cannot do so now. *See Walker v. California*, 200 F.3d 624, 626 (9th Cir.1999).

*Royal Ins. Co. v. Sea–Land Serv. Inc.*, 50 F.3d 723, 727 (9th Cir.1995)). Thus, the notice provisions and the "fair opportunity" requirement are inextricably linked, as a shipper must have a "fair opportunity" to insure shipments pursuant to the terms of which she was given notice.

In the instant case, Kesel was provided notice of UPS's general limited liability provisions through its waybill, Service Guide, and Tariff.[1] However, not one of these publications stated or even implied that Kesel was prohibited from insuring his package for a value greater than what appeared on the Ukrainian customs form, or that a shipper is in any way restricted from submitting a speculative declared value for the purposes of acquiring additional insurance. Before Kesel passed on the responsibility of shipping to his agent, Belik, he reasonably believed that, in order to insure the paintings, he had only to declare their value on the UPS waybill. Nevertheless, as the majority concedes, the UPS clerk "categorically refused" to insure the paintings under the terms as set out in UPS's waybill, Tariff, or Service Guide. In contrast to the majority's assertion, *see* Maj. Op. at 854, Belik was *not* allowed to insure his shipment for the declared value that he provided to UPS. The UPS clerk would only allow Belik to ship the paintings with UPS if he agreed to declare them for the value that the UPS clerk had determined should be applied. While these actions may not technically qualify as coercion, they are certainly not consistent with the requirements of the released valuation doctrine.

The majority asserts that this was permissible because UPS's Service Guide

informs shippers that "[b]y providing required [customs] documentation, the shipper certifies that all statements and information relating to exportation are true and correct." *See* Maj. Op. at 852. This directly contradicts the heart of the released valuation doctrine's notice provision, however, which requires not only that a tariff "recite[ ] the liability limitation" but also " 'the means to avoid it.' " *Read–Rite Corp.*, 186 F.3d at 1198 (citing *Royal Ins. Co.*, 50 F.3d at 727.). In this case, UPS certainly did not state the supposed custom's valuation limitation, let alone the means to avoid it.

In stark contrast to *King Jewelry*, in which the carrier's "airbill and [ ]Service Guide contained prominent notice[ ]" of its limitation on coverage for "items of extraordinary value," *see King Jewelry*, 316 F.3d at 962–63, 966, in the instant case there was no notice of any limitation on the items which could be insured, or the method by which they could be valued. *King Jewelry's* holding was limited to the unremarkable proposition that the shippers in that case were bound by the "extraordinary value" limitation that was clearly listed on the waybill; it cannot possibly stand for the broad proposition that a carrier complies with the released valuation doctrine even if they provide only a nominal amount of insurance above the minimum coverage, regardless of the terms they publish in their tariffs or other documents. UPS has not argued that the paintings were items of extraordinary value or that they otherwise did not fall within the general provisions for additional liability coverage. They cannot come back now and argue that the information as to

---

1. As the majority notes, each of these documents uses slightly different language, but each states substantially the same thing as the waybill: "any liability of UPS shall be ... limited to proven damages [up to $100.00] ..., unless a higher value has been de-clared.... The shipper may obtain coverage in excess of UPS's limit of liability by declaring a higher value in writing on the face of the waybill and paying an additional charge, as stated in the Tariff Guide."

customs declarations, discussed in an entirely different section of the Service Guide from the insurance provisions and hardly a commonly understood limitation of interstate carriers, *see* Maj. Op. at 854, creates an implied term in their liability coverage contract.

The majority contradicts itself, holding that Kesel received adequate notice because of the clarity of the explicit general provisions in the Service Guide, but also stating that he had an adequate opportunity to purchase additional insurance because of what it construes to be unspoken terms in the Guide. *See* Maj. Op. at 854–855. There can be no notice of terms which were not present in the contract. Both the "fair opportunity" to insure and the notice requirement are meaningless if shipping companies can coerce customers into shipping with them by misinforming them about the terms of liability coverage with impunity.

The majority compounds its misunderstanding of the released valuation doctrine by implying that Belik also had an adequate opportunity to purchase additional coverage because he "could have bought separate insurance elsewhere or shipped with a different carrier." *Id.* This is fallacious reasoning. The released valuation doctrine applies to the particular carrier that the case involves; the shipper must have had an adequate opportunity to purchase insurance *from that carrier,* not just in the general scheme of things. *See Read–Rite Corp.,* 186 F.3d at 1198 ("[carrier] contract must offer . . . a fair opportunity to purchased higher liability"); *Deiro,* 816 F.2d at 1365 ("carrier can . . . limit recovery . . . only if it grants its customers a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge.") (citing *New York, New Haven & Hartford v. Nothnagle,* 346 U.S. 128, 135, 73 S.Ct. 986, 97 L.Ed. 1500 (1953)). The majority's assertion that the mere availability of third-party insurance "shows that the shipper had a fair opportunity to purchase greater liability" misses the point. *See* Maj. Op. at 854 n. 6. If this were so, then the fair opportunity requirement of the released valuation doctrine would have absolutely no substantive content whenever a party shipped within the United States or any country where third-party insurance is available.

Kesel is not arguing that he should have had a right to insure for whatever amount he desired; he is arguing that he should have been afforded the opportunity to insure under the terms that UPS published. The majority's assertion that UPS should be allowed to limit liability to the amount declared in the customs form is unpersuasive, given that UPS included no such provision in its liability limitations. The evidence Kesel profered is sufficient to raise a triable issue of fact as to whether Belik was given a fair opportunity to purchase higher liability coverage. I therefore respectfully dissent.