FARMERS' LOAN & TRUST CO. v. NORTHERN PAC. R. CO. et al. (AMERICAN TRADING CO., Intervener).

(Circuit Court of Appeals, Second Circuit. January 15, 1903.)

No. 30.

1. RAILROAD RECEIVERS—POWERS—CONTRACT FOR TRANSPORTATION OVER CONNECTING LINES.

Receivers, authorized by order of court to continue the business of a railroad company, are clothed with substantially the same powers with respect to such business, and are subject to substantially the same liabilities as such receivers, as those applicable to the company; and in the exercise of such powers they may contract for transportation beyond the line of their road and assume liability for the entire distance over connecting lines.

2. SAME—GENERAL FREIGHT AGENT—POWER TO BIND RECEIVERS.

The general Eastern freight agent of a Western railroad being operated by receivers, having his office in New York, has apparent power, by virtue of his position, to contract for the through carriage of goods over his line of road and a connecting steamship line across the Pacific, and a contract so made by him, when clear in its terms, will bind the receivers, when the shipper has no notice of any limitation on his authority, and no knowledge that the steamship line is not owned by the railroad company and operated by the receivers.

3. CARRIERS—CONTRACT OF AFFREIGHTMENT—EFFECT OF BILL OF LADING.

The mere receipt of a bill of lading does not alter or affect a prior contract, under which goods have been actually shipped and are in course of transit, without an actual consent to the change.

4. SAME.

The fact that a shipper, after receiving a bill of lading, negotiates the same, is not a ratification or adoption of its terms, as between him and the carrier, which will operate to annul a prior valid contract under which the goods were shipped, and under which rights have vested and obligations have accrued.

5. SAME—THROUGH SHIPMENT—LIABILITY FOR DELAY IN FORWARDING.

A railroad company, whose road was being operated by receivers, had a contract with a connecting steamship company, by which a close traffic arrangement was established between them for through shipments to Japan, the steamship company being required to supply ships to meet the demands of the joint business. The receivers, through their general

freight agent in New York, made a contract for a through shipment of lead from there to Japan, to be sent by a ship leaving Tacoma on a certain date. After the shipper had contracted for the sale and delivery of the lead, in reliance on such agreement the freight agent attempted to annul the same, on the ground that the lead might be contraband of war, but, being notified that the receivers would be held liable for damages, they authorized him to reinstate the agreement, and the lead was shipped thereunder to Tacoma, and loaded on the vessel. On the day for sailing the deputy collector refused to clear the ship, on the ground that the lead was contraband of war. The ruling was reversed the following day, and before the vessel sailed, but in the meantime the lead had been unloaded and was left. It was shipped on a later vessel, but the purchaser then refused to accept it, and it was sold at a loss. *Held*, that it was incumbent on the receivers at least to use all reasonable means to prevent the delay from a risk which they had foreseen and assumed, and that, in the absence of proof that they made any effort to see that the vessel was cleared, they were liable for the resulting damages.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 112 Fed. 829.

F. B. Jennings, for appellant.

Edw. B. Hill, for appellees.

Before WALLACE, LACOMBE and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. This is an appeal from the decree of the United States Circuit Court for the Southern District of New York, dismissing the petition of the American Trading Company for the recovery of its claim against the receivers of the Northern Pacific Railroad Company. The decree under which the property of said corporation was sold provided that such sale should be subject to all obligations or liabilities contracted or incurred by said receivers, and that such claims might be enforced by such a petition in this court.

The case was tried to the court without a jury upon an agreed statement of facts, from which, inter alia, it appeared that at the time of the transactions in question the receivers of the Northern Pacific Railroad Company were carrying on the business of said road under authority of court; that the road in their possession extended from Duluth, Minn., to Tacoma, Wash.; that under contracts with various carriers they issued through bills of lading to and from points outside of their line, and that among such carriers was the Northern Pacific Steamship Company, an English company operating a line of steamers between Tacoma and points in Japan, including Yokohama; that the freight business of said railroad company over its railroad and outside connections in the eastern part of the United States was in charge of one George R. Fitch, the general Eastern agent of the receivers, at their office in the city of New York; that his only authority to act as agent of said steamship company was under a contract between the railroad company and the steamship company, but that he had been instructed by said receivers to solicit freight and to issue such bills of lading as the one herein involved, providing for through transportation by said railroad com·

pany and steamship company, and that he had no express general authority to make such contracts except as provided in said bills of lading, and no express authority to make the contract herein unless by virtue of certain telegrams to be hereinafter set forth; and that the petitioner herein did not know that the steamship company was a separate and independent company.

The material part of the agreed statement as to the transaction in question is as follows:

"(5) In September, 1894, the trading company applied to Fitch for a rate upon a proposed shipment of pig lead from New York to Yokohama, Japan, and informed him that it was of vital importance that the lead should be transported promptly and go forward by the earliest possible steamer without delay, in order to enable the trading company to fulfill a proposed agreement which it was about to make for the sale of the lead in Japan, and which would require its delivery there at a fixed date. Fitch thereupon named a rate, and undertook to forward the lead from New York on or before September 29th, and via the Northern Pacific steamer Tacoma, sailing from Tacoma October 30, 1894."

The petitioner thereupon accepted Fitch's proposition, purchased said lead in bond, and closed said proposed agreement for the sale of said lead. Fitch subsequently wrote the petitioner, confirming contract for shipment, "to be forwarded from New York on or before Sept. 29th, in accordance with shipping instructions given by me, to be forwarded from Tacoma, Washington, via Northern Pacific steamer sailing from thence October 30th," which the petitioner accepted in a letter repeating the aforesaid terms, and it arranged for shipment in accordance with Fitch's request to "see that same are rushed through without delay to connect with our steamer at Tacoma." On September 24, 1894, Fitch informed the trading company that he declined to ship, upon the ground that it might be contraband of war, and thereupon, upon the same day, the trading company wrote him a letter stating that they would hold his company responsible for any loss from failure to fulfill the contract. Thereupon Fitch notified the general freight agent of the receivers, and received the following telegram in reply:

"September 25, 1894.

"G. R. Fitch, 319 Broadway, New York.

"Your wire this date to Mr. Hannaford: Dodwell, Carhill & Co., have consented to accept the lead already contracted. Do not contract for any more. Advise quick number of pounds contracted by you and say how it will be routed. Think we should receipt for lead subject to delay.
0-900                                              J. B. Baird. WDB."

Dodwell, Carhill & Co. represented the said steamship company.

Thereupon the refusal was withdrawn, and the shipment was made under said contract, the lead being in course of transportation on the afternoon of September 27th, and reached Tacoma in time for shipment as agreed on the steamer sailing October 30th. On September 28, 1894, petitioner gave Fitch its check for the freight, and Fitch subsequently delivered a bill of lading in the usual printed form, but upon which were stamped the words, "Subject to delay," to a clerk of the petitioner, who received it without any stated objection to its terms, and it was not read or examined by him or by any officer of the company, and was immediately hypothecated for moneys

borrowed thereon. Said check was payable to the order of the Northern Pacific Railroad, was indorsed by Fitch, as general Eastern agent, and the proceeds were remitted to said receivers, and were divided and distributed under said contract with the steamship company. On September 29th, Fitch sent a copy of said bill of lading to the agent of said steamship with the following letter:

"September 29, 1894.

"Dodwell, Carhill & Co., Tacoma, Wash.
"Gentlemen:
"I hand you herewith my B L 1507 covering shipment of pig lead for export to Amer. Trading Co., Yokohama, Japan. As I have previously advised you, I have made contract guaranteeing delivery of this shipment at Yokohama by our S. S. Tacoma sailing October 30th. Will you kindly see that this connection is made, without fail.
"Yours truly,              [Sgd.]        Geo. R. Fitch,
                                         "G. E. A."

At Tacoma the lead was delivered by the receivers to the Northern Pacific Steamship Company, and was loaded upon the Tacoma, the vessel of the steamship company which was to sail on October 30th; but about 4 o'clock of the afternoon of that day the deputy collector of the port refused to clear the vessel while the lead was on board, on the ground that it was contraband of war, and telegraphed to the collector of Port Townsend for instructions. On the following day the deputy collector at Tacoma received a telegram from the collector at Port Townsend, advising that the shipment be permitted. In the meantime the master of the vessel had unloaded the lead, which delayed the ship until 9 a. m. on the morning of October 31st, when he sailed without it. The petitioner was not notified of the delay in the transhipment of the lead until November 5, 1894. The lead went forward on a later vessel, but in consequence of the delay the purchaser refused to receive the shipment, and in consequence the petitioner was obliged to sell it in the open market, and thereby suffered a loss of $26,704.02.

The petitioner contends that the original contract for through transportation was within the scope of Fitch's authority as general eastern agent of the receivers under the order of court; that it was adopted and ratified by the receivers; and that the failure to perform was due to their negligence, and was not excused by the refusal of the deputy collector to clear the ship. Counsel for the receivers contend that there was no agreement that the receivers should assume responsibility except over their line of railway; that the receivers had no power to make such a contract; that if Fitch made any such contract it was for the steamship company, and not for the receivers; that he had no authority to make any contract on behalf of the receivers for the carriage of goods beyond Tacoma; that the original agreement was merged in the bill of lading; that failure to perform was excused by impossibility of performance.

The receivers, under the order of court, were authorized to continue the business of the railroad system of said company; that is, to conduct the business of a common carrier. And receivers, acting within the scope of their authority, are clothed with substantially the same powers, and are subject to substantially the same liabilities,

as such receivers as those applicable to the corporation. Farlow v. Kelly, 108 U. S. 288, 2 Sup. Ct. 555, 27 L. Ed. 726; Beers v. Wabash, St. L. & P. Ry. Co. (C. C.) 34 Fed. 244, 247; Elliott on Railroads, §§ 567, 576, and cases cited; Hutchinson on Carriers, § 67; Beach on Receivers, § 371; Central Trust Co. v. N. Y. C. & H. R. R. R. Co., 110 N. Y. 250, 257, 18 N. E. 92, 1 L. R. A. 260; Little, Recr., v. Dusenberry, Adm., 46 N. J. Law, 614, 50 Am. Rep. 445; Wall v. Platt, 169 Mass. 398, 400, 48 N. E. 270. A carrier may contract for transportation beyond its own route and assume liability for the entire distance over connecting lines to the same extent as over its own line. R. R. v. Pratt, 22 Wall. 123, 22 L. Ed. 827; R. R. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693. No reason is apparent why receivers have not the same power, and the authorities so far as cited are to that effect. Kansas Pacific Ry. Co. v. Bayles, 19 Colo. 348, 35 Pac. 744; Elliott on Railways, supra.

Under the order of court authorizing them to conduct the business of common carriers, it was their right to so manage the property as would in their judgment secure the best results, consistently with the proper discharge of their duties. Under this authority they could and did issue through bills of lading beyond their route, and by the steamers of the steamship company.

In Myrick v. Michigan Central R. R. Co., 107 U. S. 102, 1 Sup. Ct. 425, 27 L. Ed. 325, the court says:

"Any one of the companies may agree that over the whole route its liability shall extend. In the absence of a special agreement to that effect, such liability will not attach, and the agreement will not be inferred from doubtful expressions of loose language, but only from clear and satisfactory evidence."

If Fitch had the authority to make the agreement undertaken by him, its terms are sufficiently clear and certain to meet this rule. Fitch was the general eastern freight agent of the receivers. It has been held that it is within the power of a general freight agent to contract for the carrying of goods beyond the limit of the carrier's line (White v. M. P. R. Co., 19 Mo. App. 400; Grover & Baker Sewing-Machine Co. v. Mo. Pacific R. R. Co., 70 Mo. 672, 35 Am. Rep. 444), and to stipulate for forwarding goods by a certain vessel and for carrying within a specified time (Goddard v. Mallory, 52 Barb. 87, 95; Goodrich v. Thompson, 44 N. Y. 324; Strohn v. Detroit, etc., R. R., 23 Wis. 126, 99 Am. Dec. 114).

It is elemental that, as to third parties dealing with such a general agent, thus representing a corporation in the management of its business, and acting within the scope of his apparent authority, the principal is bound to the same extent as though it had directly conducted the business itself. Isaacson v. N. Y. C. & H. R. R. R. Co., 94 N. Y. 278, 46 Am. Rep. 142; Pechner v. Phœnix Insurance Co., 65 N. Y. 195. And so far as appeared from said course of dealing and from said bills, and so far as this petitioner knew or had reason to know, said steamers were owned and operated by said receivers. In any event the receivers, having first expressly authorized Fitch to accept a certain rate for this shipment to Yokohama, and having afterwards attempted to cancel said quotation, upon notice of the petitioner's refusal to ship, and of their claim under a written contract

already given, without further inquiry as to the terms of said contract, except as to the number of pounds and route, authorized Fitch to accept the lead already contracted, and suggested to Fitch, but did not instruct him, that the receipt for lead should be subject to delay. That the receivers knew that the contract provided for shipment per steamship Tacoma on October 30th may, perhaps, be inferred from their telegram to Fitch on September 25th, asking for such information. Thus having all the knowledge of the facts which they desired, they authorized the shipment, and under said authority the "shipment was made under the contract," in bond. It sufficiently appears that the contract was made by Fitch on behalf of, and was ratified by, the receivers, and that it provided for shipping the goods by steamer sailing October 30th.

But counsel for the receivers claims that said written contract was merged in the bill of lading. That the mere receipt of a bill of lading does not affect or alter a prior contract under which goods have been actually shipped and are in course of transit without actual consent to such a change is well settled. Missouri Pacific Railway Co. v. Beeson, 30 Kan. 298, 2 Pac. 496; Swift v. Pacific Mail Steamship Co., 106 N. Y. 206, 12 N. E. 583; Railroad Co. v. Manufacturing Co., 16 Wall. 318, 21 L. Ed. 297; Gaines v. Union Transp. & Ins. Co., 28 Ohio St. 418. In Bostwick v. B. & O., etc., 45 N. Y. 712, goods were shipped under the same conditions as herein shown, namely, a through freight contract by an agent beyond the route of the defendant railroad, and with a later receipt of bills of lading. A loss having occurred, defendant claimed exemption under the conditions of bills of lading. But the court said: "The rule that prior negotiations are merged in a subsequent written contract does not apply to such a case as this." Before the issuance of the bill of lading the petitioner, relying upon said prior contract, had made its engagement to deliver at Yokohama at a fixed date, had bought the lead, paid the through freight, and had surrendered possession and control of it. The shipment was made in bond for exportation at Tacoma, and was secured upon the cars by government locks and "customs seals." Receivers could not oblige it to consent to a change in the contract.

But counsel for the receivers contends that the subsequent negotiation by petitioner of said bill conclusively shows that the petitioner adopted it and assented to all of its terms. In support of this proposition he cites Rubens v. Ludgate Hill Steamship Company (Sup.) 20 N. Y. Supp. 481, and The Henry B. Hyde (D. C.) 82 Fed. 681. But in neither of said cases was there any agreement with the shipper prior to the receipt of the bill of lading. In The Henry B. Hyde the court expressly says that it is the acceptance of the bill of lading "at the time of the delivery of the goods for shipment" which binds the shipper. The decisive answer to this contention of counsel for receivers is that such acquiescence in or adoption of said bill of lading by petitioner only affects the rights and obligations toward the parties with whom said bill was negotiated. As to them the petitioner is estopped to deny the conditions of the bill, upon the familiar principle that one who has thus negotiated such an instrument thereby ratifies

its terms and conditions. But we know of no rule by which such ratification can be extended to or taken advantage of by a carrier, in order to annul a prior valid contract under which rights have vested and obligations have accrued. This can only be done by the consent of both parties. As to the carrier the transaction is res inter alios acta.

Counsel for the receivers contend, and the court below held, that, the shipment having become impossible temporarily through the act of the deputy collector, the receivers were not bound to provide for a clearance of the vessel, and that, therefore, they are not liable for the delay. We cannot assent to this proposition, in view of the situation of the parties as shown by the submission on facts. The traffic agreement between the Northern Pacific Railroad Company and the Northern Pacific Steamship Company shows that said steamship company was expressly organized in order to establish a close alliance with said Northern Pacific Railroad Company to control freight traffic between the United States and Japan; that the steamship company was bound to supply steamships according to the exigencies of Northern Pacific traffic; and that the steamship company and railroad company were to conjointly arrange for the receipt of goods at Tacoma and assumption of liability thereon. Before this contract was made, Fitch had expressed some doubt as to whether, in view of the existing war between China and Japan, such shipment would be permitted. After the contract was made he had attempted to withdraw therefrom, but upon being notified that petitioner would hold the receivers liable for resulting damages, they secured from the steamship company a contract to accept the lead, and authorized him to carry out the contract. In these circumstances it was incumbent upon the receivers at least to show that they used all reasonable means to guard against damage resulting from delay by reason of the very risks foreseen and assumed by them. There is nothing in the stipulated facts to show that they took any precautions or exercised any care in advance, other than Fitch's letter of September 29th to the agent of the steamship company, or that, when the contemplated exigency arose, they made any effort to meet it. They assumed the obligation with knowledge of the risks incident to its discharge and the damages likely to result from delay; they reaffirmed it with knowledge that if they did not choose to assume said risks the petitioner would ship by another route and charge the difference in rates; they failed to guard against the happening of said risks, and it does not appear that, after the actual interference with the shipment from Tacoma, they made any attempt to prevent the unloading of the lead for the brief time necessary to obtain instructions from the collector, or to arrange to have it reloaded in case of a favorable report, or to secure any delay in the sailing of the vessel, and they negligently failed to notify the petitioner of the delay for six days thereafter.

The fact stated in the agreed submission, that "neither Fitch nor the receivers knew until September 24th that any contract for the sale of lead in Japan had been concluded by the trading company," does not affect the measure of damages, because they arranged for said shipment after their knowledge that such a contract had been made,

and their agent was informed, before any contract for shipment was made, that such shipment was contemplated in order to fulfill a proposed agreement, which would require its delivery in Japan at a fixed time. In these circumstances the measure of damages is the difference between the contract price and actual market value of the goods at the time of delivery. New York, Lake Erie & Western Railroad Company v. Estill and v. Leonard, 147 U. S. 591, 616, 13 Sup. Ct. 444, 37 L. Ed. 292; Messmore v. New York Shot & Lead Company, 40 N. Y. 422; Booth v. Spuyten Duyvil Rolling Mill Company, 60 N. Y. 489.

Let an order be entered reversing the decree and directing the payment to the intervener of $26,704.02, with interest thereon from the 4th day of January, 1895, and costs.