## SEAGATE TECHNOLOGY LLC,[1] Plaintiff,

v.

## DALIAN CHINA EXPRESS INTERNATIONAL CORP. LTD., d.b.a. China Express; U–Freight America Inc.; Gateway Cargo Service Center; and Does One through Ten, Defendants.

### No. C 99–04917 MHP.

United States District Court, N.D. California.

Aug. 13, 2001.

---

**1.** The original plaintiff in the action was Seagate Technology, Inc. On March 14, 2001, plaintiff filed a stipulation and request for an order allowing it to substitute Seagate Technology LLC for Seagate Technology, Inc. The court granted the order on the same day.

See also 169 F.Supp.2d 1137.

Stanley L. Gibson, Gibson Robb & Lindh LLP, San Francisco, CA, Sam D.

Delich, Flynn Delich & Wise, San Francisco, CA, Donald J. Sands, Sands Narwitz Forgie Leonard & Lerner, Los Angeles, CA, Frank A. Silane, Condon & Forsyth LLP, Los Angeles, CA, William H. King, Wright Robinson Osthimer & Tatum.

### MEMORANDUM AND ORDER

PATEL, Chief Judge.

Plaintiff Seagate Technology LLC commenced this action following the loss of its international cargo in South San Francisco in November 1998. Now before the court are China Express and U–Freight's motion for summary judgment or partial summary judgment and Seagate's counter-motions for summary judgment. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

*BACKGROUND*

Seagate is a manufacturer of computer disc drives with offices in Scotts Valley, California and the People's Republic of China. Defendants U–Freight America, Inc. ("U–Freight") and Dalian China Express International Corporation, Ltd.[2] ("China Express") are freight forwarding companies hired by Seagate to ship a cargo of disc drives from Shanghai, China to San Francisco in November 1998. Defendant Gateway Cargo Services America ("Gateway") is a ground cargo handling agent in South San Francisco, California. China Eastern Airlines ("China Eastern") is an airline that flies between Shanghai, China and San Francisco, but has its principal place of business in the People's Republic of China.

Per Seagate's instructions, U–Freight arranged for the shipment of 4,480 disc drives from Shanghai, China to San Francisco in November 1998. Seagate alleges that on November 11, 1998, China Express received the cargo, weighing 3027 kilograms, in Shanghai and issued air waybill number USH 00450778 for shipment to San Francisco. Declaration of John Fitch filed January 29, 2001 ("1 Fitch Dec."), Exh. A; Declaration of Conte Cicala, Exh. A ("China Express agreed to carry the subject shipment from Wuxi to San Francisco, California. *China Express issued an airway bill to that effect.*") (emphasis added). The waybill was issued to the shipper, Seagate Technology International (Wuxi) Co., Ltd. *See* 1 Fitch Dec. ¶ 2. The consignee copy was issued to Seagate Technology Scotts Valley on or about the same day. *Id.* Defendants claim the "Standard Trading Conditions" were on the back of copies issued to both the shipper and the consignee. *Id.* ¶ 3. Seagate alleges that the copy of the waybill it received was blank on the back.

The terms of the waybill declare a shipping rate of $2.50 per kilogram. *See* 1 Fitch Dec., Exh. A. The shipment weighed 3027 kilograms for a total cost of $7567.50. *Id.* In the top right corner of the waybill is the phrase:

> It is agreed that the goods herein are accepted in apparent good order and condition (except as noted) for carriage SUBJECT TO THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF. THE SHIPPER'S ATTENTION IS DRAWN TO THE NOTICE CONCERNING CARRIERS' LIMITATION OF LIABILITY. Shipper may increase such limitation of liability by declaring a higher value for carriage and paying a supplemental charge if required.

*Id.* (emphasis in original).

Among the conditions of contract found on the reverse of the waybill is the following language, located at paragraph 1(a):

---

**2.** The parties do not dispute that U–Freight and China Express are agents for each other.

All and any business undertaken, except all and any advice, information or services provided gratuitously by the Company is transacted subject to the conditions hereinafter set out and each of the Conditions shall be deemed to be incorporated in and to be a condition of any agreement between the Company and the Customer. *All other terms and conditions are hereby excluded.* Should the customers wish to contract with the Company otherwise than subject to these Conditions, special arrangements can be made and revised prices quoted, provided that such arrangements shall only apply if reduced to writing and signed by an authorized officer of the Customer and by an authorized officer of the Company.

*Id.* (emphasis added).

The waybill also limits China Express's liability in paragraph 21: "In no case whatsoever shall any liability of the Company howsoever arising and notwithstanding any lack of explanation exceed the value of the relevant goods or a sum of US$30 per package or US$2 per kilogram whichever is the least." *Id.* Finally, the waybill contains a notice provision under paragraph 23(a), which relieves China Express from liability unless "notice of any claim is received in writing by the Company or its agent within 14 days after the date [the goods should have been delivered and] suit is brought in the proper forum and written notice thereof received by the Company within 9 months after the date [the goods should have been delivered]." *Id.*

In the two-year period leading up to the shipment, Seagate and defendants U–Freight and China Express communicated at least two times concerning the conditions under which the cargo would be shipped from Seagate's Wuxi facility to San Francisco. In a letter dated August 5, 1997, U–Freight representative Fitch wrote to C.S. Ng of Seagate to confirm a quoted rate proposal for transportation of cargo from Shanghai to San Francisco. Declaration of C.S. Ng, Exh. 1. The proposed rate was $2.90 per kilogram for door-to-airport transportation from Shanghai to San Francisco and $2.35 per kilogram for airport-to-door transportation from San Francisco to Shanghai. *Id.* The letter also states that the quoted rate "includes providing Seagate with full replacement cost of the finished goods for lost or stolen shipments handled by China Express/U–Freight," and promises to provide a liability limitation cap.[3] *Id.*

The second communication was a letter dated March 27, 1998—after the August 5, 1997 letter but before the issuance of the air waybill—in which China Express quotes Seagate a rate of $2.50 per kilogram for cargo transport from Wuxi to San Francisco. 1 Fitch Dec ., Exh. C. This was the rate eventually charged under waybill USH–00450778. At the bottom of the letter is pre-printed language stating "[a]ll transactions are subject to our Company Trading Terms and Conditions which are available upon request." *Id.* According to Fitch, these are the same standard conditions that appear on the back of the China Express air waybill. *See* 1 Fitch Dec. ¶ 6. The letter does not otherwise mention China Express or U–Freight's liability for loss or damage. *See* 1 Fitch Dec., Exh. C.

The cargo was flown on China Eastern Airlines on November 11, 1998. 1 Fitch. Dec., Exh. B. When it arrived at San Francisco International Airport ("SFO"), China Eastern deposited it with Gateway, its ground handler, to await customs clearance. Gateway is located in South San Francisco, near, but not on the grounds of, SFO. On November 12, 1998, the day the

---

**3.** The cap was later quoted to be $1 million. *See* Ng Dec. ¶ 4.

shipment was due to be collected, Gateway could not locate it. The suspected cause of loss is theft.[4]

Seagate submitted a claim to U–Freight on November 17, 1998, informing it of its intent to file a claim. 1 Fitch Dec., Exh. B. This letter referred not to the air waybill, but to the August 5, 1997 letter in which U–Freight had agreed to be liable for up to $1 million for loss or damage. *Id.* Enclosed with the letter was a copy of air waybill number USH–00450778. *Id.* Seagate sent a follow-up email to U–Freight on December 30, 1998. *See* Declaration of Stanley L. Gibson, Exh. 3. On May 24, 1999,[5] U–Freight informed Seagate that its liability was limited to $60,540 ($20 per kilogram) "according to the tariff regulations and our contract of carriage" and offered to settle for that amount.[6] 1 Fitch Dec., Exh. D. This letter did not mention any time limit for filing suit. On July 31, 1999, Seagate rejected this offer. *See* 1 Fitch Dec., Exh. E. This lawsuit ensued.

Seagate originally filed this action in San Mateo County Superior Court on September 27, 1999, against U–Freight, China Express, Gateway and Does One through Ten. Seagate demands a judgment of $515,200 plus prejudgment interest and costs, and any other relief as the law requires. The requested judgment represents the total value of the lost disc drives.[7] On November 12, 1999, Defendants U–Freight and China Express removed the action to this court pursuant to 28 U.S.C. § 1441(b), claiming federal question jurisdiction under the Warsaw Convention or, in the alternative, federal common law. *See* 28 U.S.C. § 1331.

Defendants U–Freight and China Express cross-claimed against Gateway for equitable indemnity or comparative indemnity and contribution. They also filed a third-party claim against China Eastern for equitable indemnity and contribution and for comparative indemnity and contribution. Gateway answered the original complaint on March 2, 2000. On November 6, 2000, Gateway in turn filed a cross-claim against China Eastern Airlines for contractual indemnity and declaratory relief. In its cross-claim, Gateway alleges that it entered into a ground-handling agreement with China Eastern Airlines in which China Eastern agreed to defend and indemnify Gateway for losses such as those claimed by Seagate.

China Eastern disputes the terms of the ground-handling agreement and, on November 27, 2000, filed its own counterclaim against Gateway, requesting, among other things, declaratory judgment that it is not required to indemnify Gateway for intentional or recklessly-caused losses.

On January 29, 2001, defendants U–Freight and China Express moved for summary judgment or partial summary

4. Seagate has offered a police report describing the incident. According to the report, on the evening before Seagate went to collect its shipment, two suspects used a forged warehouse bill to claim the cargo. These suspects approached a Gateway employee, handed him a warehouse bill, which he said appeared authentic, and helped him load the disc drives into their truck. They then drove away. According to an exhibit filed in support of China Eastern's motion for summary judgment, to date 679 units of cargo have been recovered by police. Declaration of Mark T. McClenning, Exh. C.

5. Seagate claims Mr. Fitch waited to inform it of the lower liability amount because he did not want to jeopardize further business relations with Seagate.

6. The air waybill actually limits liability to $2 per kilogram. It appears that Mr. Lam, the author of the letter, overstated and/or misquoted U–Freight's liability.

7. Seagate claims 4,480 disc drives were lost and that each was valued at $115.

judgment claiming that Seagate's action is time-barred by the waybill or, in the alternative, that their liability is limited to $2 per kilogram by the waybill's terms. On March 12, 2001, Seagate filed a counter-motion for summary judgment or partial summary judgment against China Express and U–Freight.[8]

*LEGAL STANDARD*

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [its] own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citations omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The moving party discharges its burden by showing that the nonmoving party has not disclosed the existence of any "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

The court's function on a motion for summary judgment is not to make credibility determinations. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *See T.W. Elec. Serv.,* 809 F.2d at 631.

*DISCUSSION*

I. *Jurisdiction*

 ■■■ The court is troubled by the fact that it appears that Gateway never formally consented to removal to federal court. Under 28 U.S.C. section 1446(a), all defendants in a state action must join a petition for removal to federal court, except for nominal, unknown or fraudulently joined parties. *See* 28 U.S.C. § 1446(a); *see also Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1193 n. 1 (9th Cir.1988). Typically, a proper removal notice must be served within 30 days of service of Seagate's complaint. *See* 28 U.S.C. § 1446(b). The rule that all defendants must unanimously join a removal petition applies to all defendants properly joined and served. *See Emrich,* 846 at 1193 n. 1. The failure to join all proper defendants may render a removal petition procedurally defective. *See id.* But this defect is not necessarily fatal, as a court may allow amendment of a removal petition to join all proper defendants. *See id.; Parrino v. FHP, Inc.,* 146 F.3d 699, 703 (9th Cir.1998), *cert. denied,* 525 U.S. 1001, 119 S.Ct. 510, 142 L.Ed.2d 423 (1998) (allowing remand to the district court, instead of reversing and remanding to state

---

**8.** On January 22, 2001, China Eastern moved for summary judgment against U–Freight, China Express and Gateway, alleging that the liability limitations contained in its own air waybill number 781 1178 0941 are enforceable against the other three defendants. This motion is addressed in a separate memorandum and order.

court, to cure procedural defect prior to entry of judgment).

The docket contains a record of Gateway's answer to Seagate's complaint filed in this court on March 2, 2001. There is no record of whether and when Gateway was served. Nor is there a separate removal petition from Gateway or any indication that it consented to the removal petition filed by China Express and U–Freight. At the April 2, 2001 hearing on these motions, counsel for Gateway informed the court that his client consents to joinder. The court is willing to overlook this procedural defect in order to save time and resources in what has turned out to be an already difficult case procedurally.

II. *Applicable Law*

A. *Warsaw Convention*

The Warsaw Convention is an international treaty governing the international shipment of goods by air. *See* 49 U.S.C. § 40105, note. The parties disagree as to whether the Warsaw Convention applies to this action. Seagate alleges that the Convention applies, without providing much support for this contention. Defendants allege that it does not apply because the cargo was lost off of airport premises.

Under Article 18 of the Convention, a carrier is liable for damage or loss of any goods "if the occurrence which caused the damage so sustained took place during the transportation by air." *Id.* at art. 18(1). Air transportation is defined under the Convention as "the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft, or in the case of a landing outside an airport, in any place whatsoever." *Id.* at art. 18(2). This definition is limited, however, by Article 18(3), which states:

> The period of transportation by air shall not extend to any transportation by land, by sea or by river performed out-

side an airport. If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which too place during the transportation by air. *Id.* at art. 18(3).

■ In the Ninth Circuit, the presumption that the damage occurred during air transportation can be rebutted with proof that the damage occurred off of airport premises. *See Read–Rite Corp. v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1194 (9th Cir.1999). In *Read–Rite*, the damage occurred at a ground handling facility near, but not on the grounds of, London's Heathrow Airport. In deciding that the damage was not covered by the Warsaw Convention because it occurred off of airport grounds, the *Read–Rite* court cited the Second Circuit's decision in *Victoria Sales Corp. v. Emery Air Freight, Inc.*, 917 F.2d 705 (2d Cir.1990). *See Read–Rite*, 186 F.3d at 1194. The Second Circuit, in *Victoria Sales*, found the presumption that loss occurs during air transportation rebutted when the subject loss occurred at the defendant's warehouse located near, but outside the boundaries of, New York's John F. Kennedy Airport. *See Victoria Sales*, 917 F.2d at 707 ("The plain language of Article 18 draws the line at the airport's border.").

■ Seagate claims that when it went to collect its cargo from Gateway's warehouse, the cargo could not be found. This amounts to a claim that the shipment was lost while it was in Gateway's control. Because Gateway's warehouse is located outside the boundaries of SFO, and Seagate has not alleged that the loss occurred while the cargo was in transit or being handled on airport premises, the Warsaw Convention does not apply.

### A. *Federal Common Law*

The weight of authority, both in this circuit and in others, supports the application of federal common law to determine a carrier's liability for loss or damage to goods transported by air. *See Read–Rite,* 186 F.3d at 1195; *Deiro v. American Airlines, Inc.,* 816 F.2d 1360, 1365 (9th Cir. 1987); *Klicker v. Northwest Airlines, Inc.,* 563 F.2d 1310, 1316 n. 10 (9th Cir.1977) ("Federal law, rather than state law[,] may be applicable by reason of an overriding federal interest in the uniformity of obligations of domestic air carriers."); *see also Sam L. Majors Jewelers v. ABX, Inc.,* 117 F.3d 922, 928 (5th Cir.1997).

■ Determining the content of federal common law is yet another matter. *See* 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure,* § 4518 (discussing the inquiry federal courts must make in determining the content of federal common law). When determining federal common law, a court may look to many different sources, including "pre-*Erie Railroad v. Tompkins* principles of 'federal general common law,' generally recognized common-law principles of the subject-matter area involved in the case, considerations of what rule is best designed to implement the underlying federal policy or statute involved in the litigation, general considerations of equity jurisprudence or notions of systemic or party convenience, analogous federal statutes, and the content of the forum state's law." *Id.*

#### 1. *State Law/Restatement*

■ The Supreme Court has held that there is a general presumption in favor of applying state law principles in federal court actions, which holds particularly true "in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards." *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 98, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (noting that corporations law is an example of an area of law that parties expect to be governed by state-law standards). In this case, the parties have chosen to bring suit in a federal court in the Northern District of California. Seagate appears to have significant contacts with this area, as does Gateway. Neither China Express nor U–Freight has raised any choice-of-law issues, arguing, for example, that Chinese law applies to this action. Therefore, the court assumes that the parties expected, when they entered into the agreements at issue, that California law would govern any disputes arising therefrom. Accordingly, with deference to the parties' expectations and in the interests of federalism, this court will apply California contract principles to this action.

California courts rely heavily on the Restatement. *See Brinderson–Newberg Joint Venture v. Pacific Erectors, Inc.,* 971 F.2d 272, 277 (9th Cir.1992), *cert. denied,* 507 U.S. 914, 113 S.Ct. 1267, 122 L.Ed.2d 663 (1993). Thus, the court will supplement its application of state law with reference to relevant state and federal court interpretations of the Restatement in deciding this action. The Restatement (Second) of Contracts is equally helpful in that it represents "generally-recognized common-law principles of the subject-matter area involved in the case," another basis for discerning the substance of federal common law. *See* 19 Wright, Miller & Cooper § 4518.

#### 2. *Common Law Principles of Contract Interpretation*

The court may also consider federal contract law, which has its own set of principles. Like California law, federal contract law also places great weight on the Re-

statement. *See, e.g., First Interstate Bank of Idaho v. Small Bus. Admin.,* 868 F.2d 340, 343 n. 3 (9th Cir.1989). It also boasts unique rules of interpretation for specific kinds of contracts.

For example, under federal common law, a common carrier may limit its liability for harm due to loss or damage of cargo in exchange for a lower carriage rate. *See Royal Ins. Co. v. Sea–Land Serv., Inc.,* 50 F.3d 723, 725 (9th Cir.1995); *Deiro,* 816 F.2d at 1365. For the provision limiting liability to be enforceable, the carrier's "contract must offer the shipper (1) reasonable notice of limited liability, and (2) a fair opportunity to purchase higher liability." *Read–Rite,* 186 F.3d at 1198. A provision limiting liability is "prima facie valid if the face of the contract (or, in this case, air waybill) recites the liability limitation and 'the means to avoid it.' " *Id.* (quoting *Royal Ins. Co.,* 50 F.3d at 727). The shipper then has the burden of showing it was not able to purchase greater coverage. *Id.*

### III. *Governing Contract*

There are three writings at issue in this case. The first is the August 5, 1997 letter Fitch wrote to Ng. *See* Ng Dec., Exh. 1. The second is the March 27, 1998 letter from David Dai, a China Express employee, to Ng. *See* Ng Dec., Exh. 2. The final writing is the air waybill issued on November 11, 1998. The determination of which agreement applies, or of whether and how the agreements apply collectively, will determine the amount of damages, if any, to be awarded. Under the August 5, 1997 letter, for example, defendants may be liable for the full value of the disc drives or $512,000. Under the air waybill, defendants may be liable for as little as $6,054.

In its motion, Seagate contends that the air waybill does not govern the transaction, but is rather a receipt for shipment. According to U–Freight and China Express, the air waybill is the basic contract governing the transaction, and it supersedes any other prior contracts.[9]

### A. *Amount of liability*

According to the August 5, 1997 letter, U–Freight agreed to be liable for "full replacement cost of the finished goods for lost or stolen shipments handled by China Express/U–Freight." Ng. Dec., Exh. 1. Under the waybill issued November 11, 1998, U–Freight and China Express's liability is limited to $30 per package or $2 per kilogram, whichever is least. *See* 1 Fitch Dec., Exh. A ¶ 21. To support its contention that the waybill does not govern the transaction, Seagate proffers Fitch's deposition testimony that "the agreement in response to Seagate Singapore's RFQ for Asia outbound cargo" governed the terms and conditions of shipment. *See* Gibson Dec., Exh. 4, 60:13–15. Seagate further argues that defendants cannot point to any evidence, such as any statements by U–Freight or China Express employees claiming that the air waybill covers the shipment, to prove that the air waybill definitively controls.

In response, defendants have submitted a third declaration from Fitch in which he explains that when he testified at his deposition that the cargo was shipped pursuant to "the agreement in response to Seagate Singapore's RFQ for Asia outbound cargo," he was not referring to the August 5, 1997 letter but to the March 27, 1998 letter setting forth the $2.50 rate at which the shipment was actually sent. *See* 3 Fitch

---

9. U–Freight and China Express argue that by virtue of the fact that Seagate referenced the air waybill in its complaint, Seagate essentially admits this is the controlling agreement.

Seagate replies that it only referred to the waybill to identify the lost shipment; it is suing not for breach of the waybill, but for breach of the August 5, 1997 letter.

Dec. ¶ 7. In this declaration, Fitch also states that he never intended to say that any contract replaced the terms of the standard trading conditions found in the air waybill. *Id.* ¶ 8.

It does not appear that Fitch's third deposition contradicts his prior testimony regarding his understanding of which agreement governed the cargo shipment in question. At his deposition, the following exchange took place:

Q: Do you agree with me or do you agree—you don't have to agree with me at all. Do you agree that this shipment evidenced by 00207 moved pursuant to the agreement set forth in 0024?

Fitch: No.

Q: What agreement did it move pursuant to?

Fitch: It moved pursuant to the agreement in our response to Seagate Singapore's RFQ for Asia outbound cargo.

Gibson Dec., Exh. 4, 60:7–15. Importantly, Fitch denies in his deposition that the cargo was shipped according to "0024," the exhibit number assigned to the August 5, 1997 letter. If anything, Fitch implied that the August 5, 1997 letter in which U–Freight agreed to assume full responsibility for lost or damaged cargo had been superseded. And while he does not claim that the air waybill governed specifically, the March 1998 letter to which he refers does incorporate the defendants' standard trading conditions at the bottom of the page. *See* Ng Dec., Exh. 2. These standard trading conditions are the same as those found on the back of the U–Freight/China Express air waybill. 1 Fitch Dec. ¶ 6.

But Seagate argues that a contract is a meeting of the minds, and that it never agreed to a lower liability amount. This, Seagate contends, supports its argument that the air waybill is a receipt, not a contract. In *Northern Pac. R.R. Co. v. American Trading Co.*, 195 U.S. 439, 25

S.Ct. 84, 49 L.Ed. 269 (1904) the Supreme Court agreed with the Second Circuit's finding that a prior negotiated contract between a shipper and a carrier did not merge into a bill of lading with different terms and conditions issued when the shipment is delivered for transport. *See Northern Pac. R.R.*, 195 U.S. at 463–64, 25 S.Ct. 84; *aff'g Farmers' Loan & Trust Co. v. Northern Pac. R.R. Co.*, 120 F. 873, 878 (2d Cir.1903) ("That the mere receipt of a bill of lading does not affect or alter a prior contract under which goods have been actually shipped and are in course of transit without actual consent to such change is well-settled."). The Supreme Court noted that where there is a valid contract, and a bill of lading is received by a clerk or other officer of the company and not read, it cannot change the initial contract. *See Northern Pac. R.R. Co. v. American Trading Co.*, 195 U.S. 439, 25 S.Ct. 84, 49 L.Ed. 269 (1904). In other words, mere receipt of a bill of lading cannot show acquiescence to the changed terms contained therein.

While *Northern Pac.* has never been explicitly overruled, it was decided well before the advent of airline cargo shipment, computerized billing and communication, and the facsimile machine. It was also decided before the codification of the Restatement (Second) of Contracts and modern notions of course of dealing and course of performance. Furthermore, the facts of this case are distinguishable from *Northern Pac.* This action involves an intervening letter dated March 27, 1998; even if the waybill was a receipt, the issue remains whether it was a receipt under this letter or under the August 5, 1997 letter.

In their reply, defendants argue the plain language of the waybill controls because it is effectively a new contract governed by the terms on the reverse. They

argue that Seagate does not dispute, nor has it ever disputed, these terms. Defendants rely upon the language on the front of the waybill which directs the shipper's attention to the reverse side of the waybill, which, they argue, would have put Seagate on sufficient notice that the terms of the contract were different than those to which they had previously agreed.

Defendants fault Seagate for producing no evidence indicating that Seagate objected in any way to the provisions of the air waybill. Nor does Seagate dispute that it has enjoyed a long-standing business relationship with defendant China Express. Indeed, China Express contends that it has made more than 500 shipments with Seagate under the same air waybill, 137 of them pursuant to the $2.50 per kilogram rate quoted in the March 27, 1998 letter. *See* 3 Fitch Dec. ¶ 8. Furthermore, Seagate paid the freight charges on this particular air waybill without objection, as it had on the 500 previous shipments made under similar terms. Given the past relationship between the parties, and Seagate's apparent sophistication in dealing with international air shipments, the court will not impute complete naivete to Seagate; Seagate had a duty to review the terms of the waybill and object to them if it saw fit. *See Sony Corp. v. BDP Int'l, Inc.,* 1999 WL 681497 at *8 (S.D.N.Y. Sept.1, 1999) ("A sophisticated party like Sony is responsible for informing itself, either by reading each air waybill in its entirety or otherwise, of the terms of each deal that it enters into. It cannot avoid the unfavorable aspects of this particular deal by citing its own failings in keeping track of the many similar contracts into which it enters either directly or through the arrangement of buyers...."). Seagate has failed to convince the court that it was not on notice as to the terms of the air waybill, including the liability limitations contained therein. *See Hitachi Data Sys. Corp. v. Nippon Cargo Airlines Co., Ltd.,* 1995 WL 16923 *4 (N.D.Cal. Jan.6, 1995) (recognizing that a long-standing business relationship and a failure to dispute familiarity with shipping practices is sufficient evidence to put Seagate on notice of liability limitation clause).

On the other hand, defendants have failed to establish that the air waybill's liability amount provision controls. It is clear that on at least one prior occasion, in a letter of defendants' own drafting, a higher liability amount was specifically offered. Furthermore, defendants have not shown why this court should simply ignore a prior agreement, the terms of which were specifically negotiated by the parties. It is axiomatic that all writings that are part of the same transaction are interpreted together. *See* Restatement (Second) of Contracts § 202(2). Moreover, "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts § 203(a). Finally, "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." Restatement (Second) of Contracts § 203(d); *see also Brinderson–Newberg,* 971 F.2d at 279 (favoring typewritten additions to a form over the form's boilerplate provisions). From all of the writings together, giving the greatest weight to those terms that were separately negotiated, it appears that the parties had a meeting of the minds with respect to U–Freight's offer to be liable for full replacement value of lost or damaged shipments.

The evidence to support the determination of the amount of liability is factual in nature, and can only bolster a legal argument if it is sufficient and undisput-

ed.[10] To decide the question of liability the court requires more evidence of prior dealings and of the parties' intent, issues which have to do with whether a contract is integrated, and whether extrinsic evidence is admissible. The court also requires more evidence as to whether Seagate had notice that it could ask for a higher liability limit in exchange for more consideration, and as to whether Seagate was led to believe that its original agreement would govern the transaction. *See Royal Insurance Co. v. Fountain Technologies, Inc.*, 984 F.Supp. 724, 726 (S.D.N.Y. 1997) (finding a genuine issue of fact as to whether parties' prior dealings gave notice that a higher amount of liability could be declared for certain portions of the journey).

## IV. *Statute of Limitations*

The court must determine the governing limitation on the period in which to file an action for loss of cargo. If, as defendants argue, the air waybill controls, Seagate's entire action is barred, since Seagate failed to file suit within the nine-month window prescribed by the air waybill's standard conditions, which would have been by August 12, 1999. 1 Fitch Dec., Exh. A. Seagate filed this action in state court on September 27, 1999—46 days too late.

■ Unlike the liability amount controversy, where multiple figures were broached between the parties, it appears from the record submitted that there was only one mention of the time limit in which to bring suit. That was the nine-month window prescribed by the air waybill in paragraph 23(a)(ii). Even reading the three separate agreements together, a statute of limitations is mentioned only in the waybill. Since it is not contradicted, nor was it objected to, under long-standing principles of contract interpretation, it should govern.

■ Seagate further claims that the nine-month provision is unenforceable as a matter of law because the provision arguably would have been unenforceable during the air carriage portion, when the Warsaw Convention was in effect, because the Convention offers a statute of limitations provision of up to two years. *See* 49 U.S.C. § 40105, note, art. 29(1). Analogizing to cases decided under the Carriage of Goods by Sea Act, 46 App.U.S.C. § 1300, *et seq.* ("COGSA"), Seagate argues that unenforceable clauses do not spring back to life because transportation enters a stage where a treaty no longer applies as a matter of law; once such clauses are void they remain void. For this proposition, Seagate cites *David Crystal, Inc. v. Cunard Steamship Co.*, 339 F.2d 295, 299 (2d Cir.1964), which held that a contract of carriage continues to govern the relationship between a shipper and a carrier after discharge but before delivery.

■ Contrary to Seagate's assertions, *David Crystal* is inapposite. *David Crystal* does not address the situation where the contract explicitly acknowledges that it is superseded by treaty or other legislation where applicable, but reverts to its own terms when that legislation no longer applies. Paragraph 1(b) of the China Express waybill provides:

> If any legislation is compulsorily applicable to any business undertaken, these Conditions shall, as regards such business, be read as subject to such legislation and nothing in these conditions shall be construed as a surrender by the

---

**10.** At various points in the briefs, there is mention of the figure of $25,000 as a possible modification of the liability amount in the August 5, 1997 letter. It is unclear to the court who offered this figure, what form the offer took, and whether it was accepted by either or both parties. Suffice it to say that the mere mention of this third amount casts even more doubt on the ability of the court to determine a liability amount at this juncture.

Company of any of its rights or immunities or as an increase of any of its responsibilities or liabilities under such legislation and if any part of these Conditions be repugnant to such legislation to any extent such part shall as regards such business be overridden to that extent and no further.

1 Fitch Dec., Exh. A ¶ 1(b). As discussed *supra,* the Warsaw Convention specifically states that it only applies during the air carriage portion of a journey. All other transportation—by land, sea or river—is excluded from its sphere of influence. Therefore, the Warsaw Convention necessarily implies that some other contractual obligations must adhere when the air carriage portion of a cargo shipment is finished. It would be unreasonable to as-' sume that the Warsaw Convention implies that no law governs a shipment after the termination of the air carriage. It logically follows that any gaps will be supplemented by contract.

 Furthermore, there is no evidence to support Seagate's contention that a nine-month limitations period is void as unconscionable. "It is a well-settled proposition of law that the parties to a contract may stipulate therein for a period of limitation, shorter than that fixed by the statute of limitations, and that such stipulation violates no principle of public policy, provided the period fixed be not so unreasonable as to show imposition or undue advantage in some way." *Beeson v. Schloss,* 183 Cal. 618, 622–23, 192 P. 292 (1920) (upholding six-month statute of limitations); *see also Missouri, Kansas & Texas Railway Co. v. Harriman Bros.,* 227 U.S. 657, 672, 33 S.Ct. 397, 57 L.Ed. 690 (1913) (upholding 90–day limit in which to bring suit agreed to by contract even though the provision gave less time than state statute because the limit was "just and reasonable"); *Hambrecht & Quist Venture Partners v. American Medical Int'l, Inc.,* 38 Cal.App.4th 1532, 1547, 46 Cal.Rptr.2d 33

(1995) (holding that where parties agree by contract to a statute of limitations more or less than the four-year statutory provision for breach of contract in the state of California, the agreed-upon provision is enforceable as long as it is not unreasonable).

A nine-month provision is not unreasonable, particularly where, as here, the amount and value of the lost goods were immediately known. There was no further investigation required; Seagate's claim would have been the same on November 12, 1998 as it was on September 27, 1999. Without evidence that Seagate was somehow prejudiced by the nine-month provision, in that it was unable to gather facts or present its case, the court will not find the clause to be unreasonable. *See Rosenberg Bros. & Co. v. Atlantic Transp. Co. of West Virginia,* 25 F.2d 739, 742 (N.D.Cal. 1928) ("In the absence of such a showing [of hardship], the court cannot say as a matter of law that five months from the date of shipment is an unreasonable limitation period."). The Supreme Court has noted that the policy behind statutes of limitations is "to encourage promptness in the bringing of actions, that the parties shall not suffer by loss of evidence from death or disappearance of witnesses, destruction of documents or failure of memory." *Harriman Bros.,* 227 U.S. at 672, 33 S.Ct. 397. Therefore, the nine-month statute of limitations applies and Seagate's claims are barred for failure to file within the limitations period.

*CONCLUSION*

For the foregoing reasons, the court hereby DENIES Seagate's motion for summary judgment and GRANTS defendants China Express and U–Freight's motion for summary judgment.

IT IS SO ORDERED.